714 A.2d 197

**Saundra BROWN**

v.

**HOUSING OPPORTUNITIES COMMISSION OF MONTGOMERY COUNTY.**

**No. 131, Sept. Term, 1997.**

Court of Appeals of Maryland.

July 31, 1998.

Teresa Cooke, Legal Aid Bureau, Inc., Riverdale, for Petitioner.

Arthur B. Brisker (Kenneth B. Tecler, on brief), Rockville, for Respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

WILNER, Judge.

Maryland Code, § 8–402.1 of the Real Property Article (1996 Repl.Vol., 1997 Supp.) vests authority in the District Court, under certain circumstances, to order the eviction of a tenant for breach of the tenant's lease. Section 8–402.1(b) provides, in relevant part, that "[i]f the court determines that the tenant breached the terms of the lease and that the breach was substantial and warrants an eviction, the court shall give judgment for the restitution of the possession of the premises...." The issue before us is whether, after finding a substantial breach of the lease, the court may nevertheless decline to order an eviction on the ground that the breach, though substantial, does not warrant that relief. We shall answer that question in the affirmative and, as a result, shall reverse a contrary judgment entered by the Circuit Court for Montgomery County.

## BACKGROUND

In July, 1980, Saundra Brown and her family moved into a townhouse at 9703 Ambergate Court in Gaithersburg. The property was, and remains, owned by respondent, Housing Opportunities Commission of Montgomery County (HOC). Because her rent was subsidized by the Government and was based on the amount of income earned by the persons sharing the residence, Ms. Brown was required to list in the lease the persons occupying the property, to file an annual declaration of the household members and their incomes, and to notify HOC immediately of any change in her family composition. In the 1980 and 1985 leases and in the declarations filed through 1989, Ms. Brown listed her son Gabriel as a resident. In 1989, according to her, Gabriel moved out and, though visiting her from time to time, has, since then, lived elsewhere. He was therefore not included as a resident on her post–1989 declarations, and his income, we presume, was not counted in determining Ms. Brown's rent.

The lease contained a number of other covenants and restrictions, among which were Ms. Brown's agreement (1) to

conduct herself, and cause other persons in the premises with her consent to conduct themselves, in a manner that will not disturb "neighbors' peaceful enjoyment of their accommodations," (2) not to engage in or permit unlawful activity in the unit or common areas, (3) not to use controlled substances, drugs, or alcohol in any way that interferes with the rights of others, (4) not to provide accommodations for boarders or lodgers, and (5) to prevent any member of her household or guests from violating any provisions of the lease. In that last regard, the lease stated that a violation by any guest or member of her household would constitute a violation by her. A 1996 amendment to the lease specified that illegal drug or criminal activity "off the premises" was cause for eviction. Article X provided that HOC could and would terminate the lease for the tenant's "material noncompliance with the terms of [the] Lease." Material noncompliance was defined to include permitting unauthorized persons to live in the unit as well as "serious repeated interference with the rights and quiet enjoyment of other residents."

This case arose from an altercation that occurred on January 9, 1997. Exactly what happened is not entirely clear. From the police report, it appears that, while Ms. Brown and Gabriel were driving along a public road about two blocks from Ms. Brown's home, they encountered one John Favilla, who had pulled his car over to clean his windshield but may have been partially blocking the road. Words were exchanged, whereupon Gabriel got out of the car and began punching Mr. Favilla in the face. Unfortunately for Gabriel, the event was observed by two county police officers, who, when Gabriel refused to desist, intervened. Gabriel then pushed the officers. Notwithstanding that she had a baby in the car, Ms. Brown joined the fray. According to the police report, she jumped on top of the two officers, struck one of them in the rib cage with her knee, punched the other, and kicked Mr. Favilla, who was on the bottom of the pile. Gabriel and his mother were arrested and charged with assault. In the course of a search, marijuana was found in Gabriel's pocket, so he was charged with unlawful possession

as well. In all of the documents arising from this event, Gabriel gave his address as 9703 Ambergate Court.

On January 29, 1997, before any of the criminal charges were adjudicated, HOC sent a letter to Ms. Brown terminating her lease and giving her 30 days to vacate the property. According to the letter, that decision was based on the violation of the various covenants noted above—engaging in unlawful activity, disturbing the neighborhood, having a controlled substance, and providing accommodation to a boarder. When Ms. Brown failed to vacate, HOC filed a complaint in the District Court seeking restitution of the property.

By the time of trial on HOC's complaint, the criminal charges had been resolved. Gabriel was convicted of assaulting Mr. Favilla and of possessing marijuana. Ms. Brown pled guilty to hindering an arrest and received probation without judgment. The issues raised in the District Court were whether the altercation or the marijuana possession, which, as noted, took place two blocks from the property, constituted a violation of any of the covenants and whether Gabriel was, in fact, living in the property. The court found, as a fact, that Gabriel was residing in the property, and, on that basis, found three violations of the lease: Gabriel's criminal activity and possession of marijuana off the premises, forbidden by the 1996 amendment and attributable to Ms. Brown, and Gabriel's residing in the property. Because the criminal activity and drug possession occurred off the premises, was a singular rather than repeated occurrence, and did not affect any of the residents or immediate neighbors, the court did not find those violations to be substantial. Noting that Gabriel's residing in the property might constitute fraud, in that Ms. Brown's rent was calculated on the assumption that he was not residing in the property, the court found that violation to constitute a substantial breach of the lease.

The court construed § 8–402.1 as requiring, for a judgment of restitution of the premises, not just the finding of a substantial breach, but also that the breach warrants an eviction. In that regard, it weighed the fact that Ms. Brown

had occupied the property without incident for 17 years, that the criminal conduct was Gabriel's, that Gabriel, being in jail, was no longer in the property, and that he could be specifically banned from returning by HOC, and determined that, "when you weigh the scales of justice on this," it was not appropriate for Ms. Brown to be evicted. Upon that conclusion, the court entered judgment for Ms. Brown, denying the relief requested by HOC.

HOC appealed that judgment to the Circuit Court for Montgomery County, urging that it was incumbent upon the District Court, upon finding a substantial breach, to order restitution of the premises. Its view was, and remains, that a substantial breach necessarily warrants an order of restitution and that, by directing that the court "*shall* give judgment for the restitution of the premises" (emphasis added), the Legislature did not intend to allow discretion to do otherwise. In that regard, HOC viewed a substantial breach under § 8–402.1 in the same manner as a failure to pay rent under § 8–401. The circuit court agreed with HOC's interpretation, construing § 8–402.1 as creating a two-pronged, not a three-pronged test. Under its interpretation, if the court finds a breach of the lease and finds that that breach was substantial, it must order restitution of possession. In effect, the court held that a substantial breach warrants restitution as a matter of law and thus requires that such relief be provided. In an order entered December 23, 1997, the court modified the District Court judgment by awarding possession of the property.

We granted *certiorari* to review the judgment of the Circuit Court. Md.Code, §§ 12–305 and 12–307 of the Cts. & Jud. Proc. Article.

## DISCUSSION

The issue is purely one of statutory construction, and thus our goal is to discern and effectuate the intent of the legislature at the time it enacted the statute. *Clark v. State*, 348 Md. 722, 726, 705 A.2d 1164, 1166 (1998). We start, and usually end, in that endeavor with the statutory language

itself, giving the words of the statute their ordinary and common meaning. In doing so, we attempt, if reasonably possible, to give effect to all of the words and phrases used by the legislature, "so that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless, or nugatory." *Management Personnel Serv. v. Sandefur*, 300 Md. 332, 341, 478 A.2d 310, 315 (1984).

That principle alone demonstrates the fallacy in HOC's and the Circuit Court's construction. As noted, the relevant part of § 8–402.1(b) states that, "[i]f the court determines that the tenant breached the terms of the lease and that the breach was substantial *and warrants an eviction*, it shall give judgment...." (Emphasis added.) To read the statute as urged by HOC, and as the Circuit Court read it, would make the phrase "and warrants an eviction" not only superfluous, but actually antithetical to the legislative intent they necessarily presume. If the Legislature really meant to *require* an eviction upon the finding of a substantial breach and to leave no discretion in the court, there would have been no need to add that last phrase, which serves only to detract from that intent or, at the very least, make it ambiguous. A more rational interpretation, in better keeping with the rule of construction enunciated above, is that, by including the additional language, the General Assembly intended for it to have positive meaning, and the only positive meaning it could have is to vest discretion in the court to decline a judgment of eviction, even upon a finding of substantial violation, if, in the court's view, the breach does not warrant an eviction. The legislative history of § 8–402.1 supports that view.

Section 8–402.1 is the most recent of a trilogy of statutes providing landlords an expedited remedy for the recovery of leased premises. Section 8–401 permits a landlord to recover possession of leased premises whenever the tenant fails to pay rent that is currently due and payable. The landlord may file a complaint in the District Court and, subject to certain conditions, have trial within five days. If the court finds that any part of the rent is due and unpaid, it "shall determine the

amount of rent due and enter a judgment in favor of the landlord for possession of the premises." *Id.* § 8–401(c)(2). In entering the judgment, the court shall order the tenant to yield possession to the landlord within two days and, subject to certain exceptions, if the tenant fails to comply with that order, the court is required to issue a warrant directing the appropriate official to remove the tenant from the property. *Id.* § 8–401(c)(3) and (d). If the tenant has been sufficiently served, the court may also enter a money judgment for the rent due.[1]

Section 8–402 deals with tenants holding over after termination of the lease. It permits the landlord to recover both possession of the property, provided that the landlord has given written notice to quit at least one month prior to termination of the lease, as well as damages in an amount not less than the apportioned rent for the holdover period. If, upon trial or upon the tenant's nonappearance, the court finds that the landlord had been in possession, that the lease has expired, that notice to quit had been given, and that the tenant refused to vacate, the court "shall thereupon give judgment for the restitution of the possession of said premises . . . ." *Id.* § 8–402(b)(2).

Section 8–402.1, as noted, provides a procedure for recovery of the premises when the tenant has breached a covenant of the lease, other than the covenant to pay rent that is currently due.

These three statutes, like nearly all of our landlord-tenant law, derive from over 1,000 years of English property law, but were enacted at different times to deal with different situations. As landlord-tenant relationships began to evolve from the arcane concepts and rules governing English feudal estates and tenures, new remedies and procedures had to be developed in order to determine who had the right to possess

---

1. If only possession is sought, the complaint may be served on the tenant by first class mail, with a copy posted on the premises. If a money judgment is sought for the rent due, personal service must be made on the tenant. § 8–401(c)(2).

land. The common law action of ejectment was created, and later expanded, to serve that function. Although initially designed to allow an ousted tenant to recover possession, it became, in time, usable by landlords as well, to recover possession from their tenants.[2]

---

2. Judge Eldridge recently traced some of the history of the action of ejectment in *Martin v. Howard County*, 349 Md. 469, 481–83 n. 9, 709 A.2d 125, 132 n. 9 (1998). Blackstone describes the manner in which the initial, limited action of ejectment became converted, by what he terms a "contrivance," into a method of trying title to the property in question, and with title, the right of a landlord to recover possession. Originally, the action could be brought only by a lessee to recover for the injury arising from the lessee's dispossession, by either the landlord or some third party. The practice developed, however, of a person claiming title to the property, including a landlord (A), formally entering upon the land and immediately executing a lease of the land to a third party (C), who, by virtue of that lease, would enter into temporary possession. Either the former tenant (B) or some person in connivance with A(D), would then oust C, who would thereupon file an action of ejectment against that person. In order to recover possession, C would have to establish the title of his lessor (A), and it was in that manner that the issue of title would be brought before the court. If the person ousting C was D—someone other than the initial tenant (B)—C was required to give notice to B and, upon request, make B a defendant in the case. *See* 3 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND, Ch. 11 (1768).

During the reign of Charles II, Lord Chief Justice Rolle concocted a scheme—a "string of legal fictions" in Blackstone's words—that avoided the need for an actual entry, lease, and ouster by simply regarding them as having occurred. C, the ejectment action plaintiff, would allege a lease from A, C's entry on to the land, and an ouster by D, who would be the nominal defendant. D would send notice of the action to the real tenant, B, and inform B that D had no intention of defending the case. B then had a right to be substituted as the defendant, but only if B acknowledged the lease from A to C, the entry by C, and an ouster by B, all of which were fictitious. At trial, A would be required to establish his or her title to the land so that judgment could be entered for C. Whether under the earlier approach or under Rolle's modification of it, the case was brought by a plaintiff who had no interest in the property, against a defendant who had no interest in the property, upon an actual or fictional lease that had no value other than satisfying an artificial element of the action.

Rolle's approach still left open the prospect of a collusive action by the tenant to defeat his landlord's title, by invoking a fictional lease by a person serving as a surrogate for the tenant. The landlord would not be a party to the action, likely would never know of it, and would have no ability to defend his or her title. To deal with that problem, Parliament, in 1738, enacted 11 Geo. II, Ch. 19, which required

The action, though available, became cumbersome, time-consuming, and subject to bullying and delaying tactics by the tenant, including the obtention of injunctions in the equity court. In 1731, Parliament recognized that "great Inconveniencies do frequently happen to Lessors and Landlords, in Cases of Re-entry for Nonpayment of Rent," noting not only "the Expence, Charge, and Delay of recovering in Ejectment," but that "it often happens that after such a Re-entry is made, the Lessee or his Assignee, upon one or more bills filed in a Court of Equity . . . holds out the Lessor or Landlord by Injunction, from recovering the Possession. . . ." By enacting 4 Geo. II, Ch. 28, Parliament attempted to deal with those problems by (1) requiring tenants wilfully holding over after termination of the lease to pay rent in an amount equivalent to double the yearly value of the property and authorizing landlords to recover that rent through an action of debt, and (2) permitting landlords having a right under their lease of reentry upon nonpayment of rent, to proceed in ejectment without the need of a formal demand for the rent and actual or fictional reentry upon the land by merely serving or posting notice, whenever six months rent was in arrears. The tenant could abort the ejectment action directly only by paying or tendering to the landlord, or paying into court, prior to trial, all rent in arrears and costs. The issuance or continuance of an injunction against the ejectment proceeding was prohibited unless, within 40 days after the filing of an answer by the landlord in the equity action, the tenant deposited with the proper officer the full amount of rent that the landlord swore was due.

That statute was incorporated into Maryland law in 1776 through Article 5 of the Maryland Declaration of Rights. *See*

tenants, on pain of forfeiting three years rent, to notify their landlords when served with any complaint in ejectment and allowing the landlord to be made a party defendant.

Surrounded by these various fictions, the courts considered the action, when brought in this context, to be "really brought by the lessor of the plaintiff against the tenant in possession." 3 BLACKSTONE, *supra*, at 206.

2 Julian J. Alexander, British Statutes in Force in Maryland, 950 (Coe, 2d ed.1912); *Campbell v. Shipley,* 41 Md. 81, 93 (1874); and *cf. Mackubin v. Whetcroft,* 4 H. & McH. 135, 154 (1798). The first part remained intact until 1971, when it was codified in a modified form. 1971 Md. Laws, Ch. 649, § 7. The second part was codified, with amendments, in 1872.

In 1793, the General Assembly enacted what it termed a "summary mode" of recovering possession of land from holdover tenants. By 1793 Md. Laws, Ch. 43, it provided that, in any tenancy for years or at will, if, upon the expiration of the lease the landlord gave written notice to quit and the tenant refused, the landlord, after one month, could file suit to recover possession. A jury was to be summoned within four days, and, if the jury found that a valid lease had been made and expired and the proper notice had been given, the court was authorized to issue a warrant to the sheriff directing him to deliver possession to the landlord and to enter a judgment for costs. See *Bringe v. Collins,* 274 Md. 338, 347 n. 3, 335 A.2d 670, 676, *application for stay denied,* 421 U.S. 983, 95 S.Ct. 1986, 44 L.Ed.2d 475 (1975) for a discussion of the 1793 statute. That 1793 statute, with subsequent amendments added over the years, evolved into what is now § 8–402(b). The right to damages for losses sustained by the tenant's holding over, first provided in the 1731 English statute, evolved into current § 8–402(a). As noted, there is no caveat in § 8–402 comparable to that in § 8–402.1. If the landlord proves the four requisite elements—prior possession, a lease that has expired, proper notice to quit, and the tenant's refusal to vacate—the landlord is entitled to a judgment of restitution, subject to the provisions for appeal.

The right of a landlord to recover possession upon the nonpayment of rent continued under the English statute until 1872. In 1870, the Legislature abolished the fictions that governed the common law action of ejectment, declaring that such actions may not be brought in the names of fictitious parties or based on a fictitious lease and that "the real persons who are proper as plaintiff and defendant, shall be named."

1870 Md. Laws, Ch. 420. Two years later, by 1872 Md. Laws, Ch. 346, the Legislature codified, with some changes, the second section of 4 Geo. II, Ch. 28, permitting landlords having the right of reentry for non-payment of rent to sue in ejectment to recover possession of leased premises whenever a half-year's rent was in arrears, without formal demand or reentry but only upon a notice given or posted. The 1872 law recognized the ability of a tenant to seek relief in equity within six months after execution of the judgment of restitution and expressed no limitation on that ability. Through amendments made to the 1870 law on ejectment generally, however, the 1872 statute, for the first time, permitted landlords to recover not only possession but "mesne profits and damages" caused by the ejectment and detention of the premises, up to the time of determination of the case. Under the British statute, only nominal damages were recoverable. *Gibbs v. Didier*, 125 Md. 486, 497, 94 A. 100, 103 (1915).

The current format provided for in § 8–401 came about in 1937. Through 1937 Md. Laws, Ch. 529, the Legislature provided that, whenever a tenant under any rental agreement failed to pay the rent provided for in the agreement, it was lawful for the landlord to repossess the rented premises. That statutory right supplanted the need for a right of reentry to be reserved in the lease or rental agreement. To effectuate the statutory right, the Legislature created the expedited approach of a simple complaint describing the property in general terms and stating the name of the tenant and the amount of rent due. The right of the tenant to abort the proceeding by paying the rent was retained, and, through subsequent enactments, extended to allow the tenant to re-deem the property by paying the rent established in the warrant at any time prior to execution of the eviction order.

With the 1937 enactment, as subsequently amended, the law provided an expedited procedure for landlords to recover leased premises when (1) the tenant held over after termi-nation of the lease, or (2) the tenant failed to pay rent that was

currently due.[3] No such procedure existed, however, for the case in which the tenant violated some other covenant of the lease, notwithstanding a provision in the lease declaring such a breach to constitute a default and authorizing the landlord to terminate the lease. In that situation, the landlord had but two options: (1) an action for breach of contract, in which the landlord might recover damages or obtain injunctive or specific performance relief, *see Live Stock Co. v. Rendering Co.*, 179 Md. 117, 17 A.2d 130 (1941); *North Avenue Market v. Keys*, 164 Md. 185, 164 A. 152 (1933), *Redwood Hotel v. Korbien*, 195 Md. 402, 73 A.2d 468 (1950); *Martin v. Howard County, supra*, 349 Md. at 493, 709 A.2d at 137, or (2) if the lease so provided, the landlord could terminate the lease by reason of the breach and thereupon treat the tenant as one holding over and attempt to recover possession through an action in ejectment. *Schlerf v. Bond*, 139 Md. 10, 114 A. 739 (1921); *Streeter v. Middlemas*, 240 Md. 169, 213 A.2d 471 (1965).

The problem with proceeding in ejectment, especially when the action was based on the breach of a covenant to pay rent, taxes, or some other sum in a timely manner, was the ability of the tenant to seek the assistance of equity to enjoin the proceeding. In *Dreisonstok v. Dworman Bldg. Corp.*, 264 Md. 50, 284 A.2d 400 (1971), we observed that courts of equity treat a landlord's right to forfeiture for the failure to pay money as being "a mere security for the payment of the obligation" and that "equitable relief is ordinarily granted upon the payment of the principal sum with interest and costs that have accrued, these payments being regarded as compensation for nonpayment when the obligation was due." *See also Carpenter v. Wilson*, 100 Md. 13, 59 A. 186 (1904); *Wylie v. Kirby*, 115 Md. 282, 80 A. 962 (1911); 2 JOHN N. POMEROY, A TREATISE ON EQUITY JURISPRUDENCE, § 453 (Symons, 5th ed.1941). Equitable relief might eventually be denied if the

---

**3.** Termination proceedings in Baltimore City were governed by a separate public local law that differed in some details from the State law. *See* Allan W. Rhynhart, *Notes on the Law of Landlord and Tenant*, 20 MD. L.REV. 1 (1960). The differences are not germane to the issue in this case.

tenant "has violated fundamental principles of fair dealing," *Dreisonstok, supra,* 264 Md. at 59, 284 A.2d at 404, if, due to the tenant's precarious financial condition, the likelihood of prompt payment in the future was questionable, *Evergreen Corp. v. Pacheo,* 218 Md. 230, 145 A.2d 774 (1958), if the tenant failed to comply with court-ordered conditions, *Streeter v. Middlemas, supra,* 240 Md. 169, 213 A.2d 471, or if the breach was of a covenant other than to pay money and there was no other effective remedy for the breach, 2 POMEROY, *supra,* § 454, *Sheets v. Selden,* 74 U.S. (7 Wall.) 416, 19 L.Ed. 66 (1869),[4] but the cost and delay occasioned by the proceeding and the possibility that relief might be granted were certainly daunting.

Perhaps to avoid that prospect, landlords began using the summary eviction procedure in § 8–402 to remedy breaches of covenants other than the covenant to pay rent. Section 8–402.1, it appears, was intended to stop that practice. The first attempt to enact a procedure dealing specifically with breaches of covenant other than the covenant to pay rent was in the 1977 session of the General Assembly. The impetus for it came from the District Court Ad Hoc Committee on District Court Constables. In a letter dated January 25, 1977 to the Maryland Judicial Conference, Judge Alpert, on behalf of that committee, proposed certain legislation for the 1977 session, including an addition to § 8–402 "providing for an action for breach of lease." Judge Alpert noted that "[a]ggrieved landlords have been filing these actions on tenant holding over forms when they are not, in reality, tenant holding over actions." A month later, in apparent response to Judge Alpert's letter, Senate Bill 964 was introduced to add as a new § 8–402(b)(6) language similar to that contained in present § 8–402.1. Senate Bill 964 did not pass, but a modified version of it, introduced into the next session as Senate Bill 570, was

---

4. In *Sheets,* the Supreme Court expressed the view, with respect to covenants other than the payment of rent, that "where the elements of fraud, accident and mistake are wanting, and the measure of compensation is uncertain, equity will not interfere." 74 U.S. (7 Wall.) at 422, 19 L.Ed. at 168.

enacted as § 8–402.1.1978 Md. Laws, Ch. 478. Both versions contained the language at issue here.

The intent of the Legislature to create a separate, self-contained District Court procedure by which landlords could recover possession of leased premises based on breaches of covenants other than the payment of rent is clear. The General Assembly was not content to have the practice of using § 8–402 continued, but neither did it intend to leave landlords only to the common law action of ejectment. The new remedy, however, was necessarily fashioned in the light of (1) the long-standing principle that forfeitures for breach of covenant were not a matter of right but were subject to the intervention of equity when regarded as unfair or inappropriate, and (2) the availability of alternative remedies for landlords in breach of covenant cases, such as damages and equitable relief. See *Redwood Hotel v. Korbien, supra,* 195 Md. 402, 73 A.2d 468; *Streeter v. Middlemas, supra,* 240 Md. 169, 213 A.2d 471. The inclusion of the phrase in question, conditioning a forfeiture on a finding that the breach in question warranted that relief, is in perfect harmony with those considerations, even if it did, to some extent, vest in the District Court a more general discretion to preclude a forfeiture than previously had been exercised by the equity courts. The court is entitled, and indeed directed, to weigh all of the relevant factors before declaring a forfeiture and evicting the tenant, including the actual loss or damage caused by the violation at issue, the likelihood of future violations, and the existence of effective alternative remedies for past or existing violations. The District Court judge recognized that duty in this case, and, as HOC's attack was solely on the existence of the duty, rather than the manner in which it was exercised, the Circuit Court should have affirmed the judgment.

JUDGMENT OF CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE JUDGMENT OF THE DISTRICT COURT; RESPONDENT TO PAY THE COSTS.