746 A.2d 947

**Angelina KEENEY, Personal Representative
of the Estate of Charles C. Genovese**

v.

**ALLSTATE INSURANCE COMPANY.**

**No. 690, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

March 1, 2000.

Bruce D. Hechmer (Harry W. Blondell and William J. Blondell, Jr., Chartered, on the brief), Baltimore, for appellant.

Janet M. Truhe (Truhe & Maier, P.A., Towson, and Jacqueline M. Bunty, on the brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and SALMON and ADKINS, JJ.

SALMON, Judge.

Article 48A, section 542(b), of the Maryland Annotated Code (Supp.1995), provides: [1]

---

**1.** Article 48A, section 542(b), is now found in section 19–511 of the Insurance Article of the Maryland Code (1997). Section 19–511 is substantively the same as article 48A, section 542(b).

*Written offer to settle.*—(1) If an injured person receives a written offer, from a motor vehicle insurance liability insurer or that insurer's authorized agent, to settle a claim for bodily injury or death and the amount of the offer of settlement in combination with any other settlements arising out of the same occurrence would exhaust the applicable bodily injury or death limits of the liability insurance, policies, bonds, and securities, the injured person shall submit by certified mail, to any insurer that provides uninsured motorist coverage for the bodily injury or death, a copy of the liability insurer's written offer to settle.

(2) Within 60 days after receipt of the notice required under paragraph (1) of this subsection, the uninsured motorist insurer shall send the injured person:

(i) Written consent to acceptance of the settlement offer and to the execution of releases; or

(ii) Written refusal to consent to acceptance of the settlement offer.

(3) Within 30 days after a refusal under paragraph (b)(2)(ii) of this subsection, the uninsured motorist insurer shall pay to the injured person the amount of the settlement offer.

(4) (i) Payment as described in paragraph (3) of this subsection shall preserve the uninsured motorist insurer's subrogation rights against the liability insurer and its insured.

(ii) Receipt by the insured person of the payment described in paragraph (3) of this subsection shall constitute the assignment, up to the amount of the payment, of any recovery on behalf of the injured person that is subsequently paid from the applicable liability insurance policies, bonds, and securities.

(5) The injured person may accept the settlement offer and execute releases in favor of the liability insurer and its insured without prejudice to any claim the injured person may have against the uninsured motorist insurer:

(i) On receipt of written consent to acceptance of the settlement offer and to the execution of releases; or

(ii) If the uninsured motorist insurer has not met the requirements of paragraphs (2) or (3) of this subsection.

The sole contention of the appellant, Angelina Keeney, personal representative of the estate of Charles C. Genovese, is that the trial judge erred when he ruled that section 542(b) applies only to automobile accidents that occur after October 1, 1995.

This case stems from an automobile accident that occurred on September 9, 1995. On that day Charles C. Genovese (Genovese) was proceeding eastbound on Edison Highway near the intersection of Sinclair Lane in Baltimore City when a motor vehicle, operated by Thomas E. Neubauer (Neubauer), crashed into the rear of his vehicle. This collision caused Genovese's vehicle to collide with several others, and as a result, Genovese was seriously injured; due to these injuries he was rushed to Johns Hopkins Hospital where he died.

On the date of the accident, Neubauer was insured by Fireman's Fund Insurance Company ("Fireman's Fund") under a policy that provided liability limits of $25,000 per person/$50,000 per occurrence. Genovese, in turn, was covered by a policy issued by Allstate Insurance Company. Allstate's policy provided uninsured motorist coverage (UM), with policy limits of $50,000 per person/$100,000 per occurrence. Under the policy, an uninsured vehicle was defined so as to include underinsured vehicles. A vehicle that had bodily injury liability protection in effect and applicable at the time of the accident but in an amount less than the applicable UM limits of the Allstate policy, met the policy's definition of an underinsured vehicle.

Allstate's UM endorsement included the following provision: [A]ll rights of recovery against any responsible party or insurer must be maintained and preserved for our benefit.

By letter dated December 19, 1995, appellant's counsel notified Allstate that Fireman's Fund had tendered its $25,000

policy limits for injuries Genovese had sustained in the subject accident. Appellant's counsel demanded that Allstate pay to the estate of Charles Genovese its UM limits, i.e., $25,000, which was the difference between Allstate's UM limits of $50,000 and Fireman's Fund's liability limits. Between December 19, 1995, and February 21, 1996, Allstate and appellant's counsel exchanged correspondence, but Allstate gave no answer to the question as to whether it would consent to the release of Neubauer or to the acceptance of Fireman's Fund's offer.

Appellant's counsel, on February 21, 1996, advised Allstate in writing that, because sixty-four days had passed since the letter of December 19 and because Allstate still had not advised appellant as to whether it would consent to the settlement offer of Fireman's Fund, appellant had decided, "in accordance with ... Article 48A, section 542[b] ... that [she would accept] ... Fireman's Fund['s offer]." Appellant also advised that she intended "to continue to pursue the uninsured motorist claim against Allstate."

Allstate's representative promptly wrote back to appellant's counsel and warned that "if you accept Fireman's Fund's offer and sign the release, Allstate will also be released." In addition, Allstate advised appellant's counsel that in its opinion section 542(b) of article 48A did not affect the subject accident because it "only applies to cause[s] of action [that arise] before the date ... of October 1, 1995."

On March 19, 1996, appellant gave a "full and final release covering all claims or right of action of every description, past, present, or future, to ... Neubauer." Nearly fourteen months later, on May 6, 1997, appellant filed a complaint in the Circuit Court for Baltimore City against Allstate. The complaint alleged that Allstate had breached its contract by failing to pay appellant the amount due under its UM endorsement.

Allstate filed an answer to the complaint, along with a motion for summary judgment and a memorandum in support thereof. In its memorandum, Allstate contended that by

granting a full release to Neubauer, appellant had violated the terms of the insurance contract because, under the contract, an injured party could not settle a liability claim without the express consent of the UM carrier. Appellant countered by contending that it had not breached its contract because it had complied with the terms of article 48A, section 542(b).

The memorandum of appellant, as well as the memorandum of law filed by Allstate, focused on the issue of whether article 48A, section 542(b), was applicable in this case. The trial judge ruled that it was not and, accordingly, granted summary judgment in favor of Allstate.

## QUESTION PRESENTED

■ Did the trial court err when it held that Article 48A, section 542(b), did not apply to cases arising out of automobile accidents that occurred prior to October 1, 1995.

## ANALYSIS

Senate Bill 253, which was to become article 48A, section 542(b), was sponsored by Senator Vernon Boozer of Baltimore County. The purpose of Senator Boozer's bill, according to the "Senate floor report," was to provide a

remedy to a problem that has *existed in Maryland's tort system* for some time. Currently, an injured person who makes a claim against a liability carrier for limits available under the liability policy is frequently not allowed by their uninsured/ underinsured motorist carrier to give the liability carrier a full release of their claim. Therefore, if the injured person wishes to make an additional claim for their injuries against their underinsured motorist coverage, they get caught in a situation where the liability carrier will not give them the limits of the at-fault party's policy without a release and the uninsured/underinsured motorist carrier will not allow them to give a release to the liability carrier. As a result, they are unable to recover funds from either carrier. This dilemma can cause a lengthy delay in settlement.

Senate Bill 253 would eliminate this dilemma by requiring the uninsured/ underinsured motorist carrier to: (1) allow their injured insured to settle with the liability carrier and provide a release; or (2) pay their injured insured themselves to fully maintain their subrogation rights against the liable party. Therefore, the insured party gets his money more quickly and the uninsured/underinsured motorist carrier would have "up front" the liability settlement.

(Emphasis added.)

The summary of the bill provided in the Senate floor report was terse, viz:

SENATE BILL 253 ESTABLISHES A SETTLEMENT PROCEDURE TO BE FOLLOWED WHEN A CLAIMANT IS INJURED BY A PARTY WHOSE LIABILITY INSURANCE LIMIT IS LESS THAN THE CLAIMANT'S UNINSURED MOTORIST LIMITS.

On May 25, 1995, Senate Bill 253 was signed into law by Governor Parris Glendening as Chapter 516 laws of 1995. By its terms, Chapter 516 provided: "[T]he provisions of this Act shall apply to any cause of action arising on or after October 1, 1995.... AND BE IT FURTHER ENACTED, That this Act shall take effect October 1, 1995."

The statute does not define the term "cause of action," and it leaves open the question as to whether the Legislature intended the term to refer to tort actions or to first party contract actions by the insured against his or her insurance carrier. Appellant contends that the Legislature intended the phrase "cause of action" to mean the contract action between an insured and the insurer.

■ In dealing with this issue of statutory construction we must look for and effectuate the intent of the Legislature at the time it enacted the statute. *See Brown v. Housing Opportunities Comm'n of Montgomery County,* 350 Md. 570, 575, 714 A.2d 197 (1998). If, as here, the language of a statute is ambiguous, "we seek to discern the intent of the legislature from surrounding circumstances, such as legislative history, prior case law, and the purposes upon which the statutory

framework was based." *Philip Electronics North America v. Wright*, 348 Md. 209, 217, 703 A.2d 150 (1997).

As shown by the Senate floor report, the legislative goal of section 542(b), was to resolve a common problem that beset litigants attempting to settle *tort* claims. The liability carrier for the allegedly negligent party typically was not willing to pay its policy limits unless it received a release from the injured party. The liability carrier's reluctance to sign a release was based on a well-founded fear that, if it paid its limits without a release, it would subject its insured to a subrogation claim by the injured party's UM carrier; and if, as a defendant in a subrogation suit, the insured had to pay money out of his/her pocket, it might well subject the insurer to liability in a bad-faith action filed against it by its own insured. In a bad faith action, the liability carrier might be called upon to defend an allegation that by paying its policy limits without obtaining a release, it lost all control over any settlement made by the UM carrier to the beneficiary under the UM policy and therefore the liability carrier had not fulfilled its obligations to protect its insured. In other words, the liability insurance company's insured might successfully argue that he/she was subjected to a suit for subrogation by the UM carrier that would have been avoided if a release had been obtained. On the other hand, prior to the enactment of section 542(b), the UM carrier typically would not consent to a release being signed because that would destroy any possibility of obtaining in a subrogation suit any of its money back from the alleged negligent party. In sum, the main purpose and effect of the statute was to resolve a recurrent problem that arose when parties attempted to settle tort cases. The legislative history provides no indication that the legislative purpose was to resolve disputes that might arise in contract actions between UM carriers and their insureds.

Article 48A, section 542(b), affects a substantive right. As but one example, under section 542(b), the beneficiary of a UM policy acquired the right to demand from his/her UM insurer that the latter make an election, viz:

either immediately pay the insured the liability carrier's limit or consent to a release of the alleged tortfeasor. Under the statute, if the UM carrier pays its insured the amount offered by the liability carrier, and the UM carrier later exercises its subrogation rights against the alleged wrongdoer, the beneficiary under the UM policy does not have to repay the UM carrier for the money advanced if the alleged wrongdoer wins the subrogation suit. The UM carrier would thus have to make a non-refundable payment to its insured in exchange for the right to sue the alleged wrongdoer—a right it could have exercised without cost prior to the enactment of section 542(b). This is important because statutes that affect substantive rights are presumed to apply prospectively only. *See State Farm Mut. Auto. Ins. Co. v. Hearn*, 242 Md. 575, 582, 219 A.2d 820 (1966).

 If appellant's construction of article 48A, section 542(b), were to obtain, the substantive rights of insurers who issue UM policies would be adversely affected without giving the insurers who provide UM coverage a chance to adjust their policies and premiums to reflect the changes in the law. In this regard, the *Hearn* Court stated:

> "The general presumption is that all statutes, State and federal, are intended to operate prospectively and *the presumption is found to have been rebutted only if there are clear expressions in the statute to the contrary.* Retroact[ivity], even where permissible, is not favored and is not found, except upon the plainest mandate in the act." *Bell v. State*, 236 Md. 356, 369, 204 A.2d 54 (1964). This rule of construction is particularly applicable where the statute adversely affects substantive rights, rather than only altering procedural machinery.

*Id.* (emphasis added) (citations omitted) (alteration in original).

There is nothing in the statute that indicates that the Legislature intended it to apply retroactively so as to affect substantive rights of insured (and insurers) in cases where the automobile accident that gives rise to the UM claim occurred prior to October 1, 1995.

It is also significant in interpreting article 48A, section 542(b), that the insured under a UM policy can manipulate the date that a contract cause of action arises. After all, under certain circumstances, a first-party contract cause of action against an UM carrier does not arise—until the insured demands compensation and that demand is rejected. . *See Lane v. Nationwide Mutual Insurance Company*, 321 Md. 165, 171–74, 582 A.2d 501 (1990). That demand need not be made within three years after the accident. Rather, at the U.M.'s insured's option, the insured can first bring a tort action and, after judgment is rendered in the tort suit, make a demand. *Id.* In *Lane*, the Court of Appeals explained that when an insured brings a timely tort action against the uninsured/underinsured motorist, having notified its UM carrier of the tort action,

> and when the insured thereafter either during the pendency of the tort action or within a reasonable time after judgment in the tort case makes a claim upon his insurer for uninsured motorist benefits, the statute of limitations does not begin running against the insured until the insurer denies that claim, thereby allegedly breaching the contract.

*Id.* at 177, 582 A.2d 501.

The fact that the date a contract action arises can be manipulated standing alone certainly is not dispositive of the issue presented. But that fact, coupled with the fact that the Legislature saw fit to give a four-month (May 25 to October 1, 1995) grace period before the statute was to become effective, does have significance. If the Legislature intended the term "cause of action" to mean contract cause of action, giving the grace period would make little sense because an insured could delay the date when the cause of action arises. *Id.*

It seems evident that the grace period was given to effect a date that cannot be manipulated—the date of the motor tort. Under the latter interpretation, a grace period was needed in order that the insurers could adjust their policies and premiums to reflect the change in substantive rights.

The case that is most directly on point with the one *sub judice* is *Hearn*. The statute at issue in *Hearn* became effective on June 1, 1964. *See Hearn*, 242 Md. at 582, 219 A.2d 820. Prior to that date, most automobile liability policies provided that the insured was required to give the insurer notice of the accident "as soon as possible"; if the insured did not give such notice, the insurer could deny coverage even if it could not show that it had been prejudiced by the late notice. *See id.* at 581–82, 219 A.2d 820. The new statute required that the liability carrier show that it had been prejudiced by late notice before it could disclaim coverage. *See id.* at 582, 219 A.2d 820.

The automobile accident that was the subject of the *Hearn* decision occurred on March 3, 1964—about three months before the statute's effective date. *See id.* at 583, 219 A.2d 820. A liability carrier, State Farm, on July 20, 1964—some four and a half months after the accident and about six weeks after the statute became effective—received notice that its insured had been sued. *See id.* at 579–80, 219 A.2d 820. One of the questions addressed by the *Hearn* Court was whether the statute was applicable in a declaratory judgment action by the putative insured against, *inter alia*, a liability insurer (State Farm). State Farm contended that the statute was inapplicable, and it, therefore, did not have to prove that the late notice by its "insured" caused it prejudice. *See id.* at 580, 219 A.2d 820. The *Hearn* Court, invoking the presumption that statutes are to operate prospectively, held that the new statute did not apply to coverage disputes arising out of auto accidents that occurred prior to June 1, 1964. *See id.* at 583, 219 A.2d 820. In the words of the Court, "[t]he substantive right of State Farm to notice in accordance with the policy had accrued before the statute came into effect." *See id.*

As in *Hearn*, here the insurer had rights that vested some three weeks before the effective date of section 542(b). The terms of Allstate's policy in effect at the time of the subject accident, which related to Allstate's right to enforce its subrogation interests, vested at the time of the accident. Those vested rights could not possibly be affected by section 542(b)

unless we were to rule that the statute is to be applied retroactively. Retroactive application of statutes is not favored and is to be avoided unless the statute clearly indicates a legislative intent for retroactive application. Here, there is no clear expression of legislative intent that the statute be applied retroactively.

In the treatise *Maryland Motor Vehicle Insurance*, the author says:

> [Article 48A, section 542(b),] became effective October 1, 1995, and applies to causes of action arising on or after October 1, 1995, leaving still unanswered the question of settlement procedures for causes of actions arising before the effective date of the new law. The legislature did not define what it meant by the phrase "cause of action." Some argue that it refers to the contract action against the uninsured motorist insurer; others believe that it refers to the tort action. The dispute has significance in those situations where the accident occurred before October 1, 1995, but the claimant was not offered settlement monies from the liability insurer until after October 1, 1995. Those who argue that the phrase "cause of action" refers to the contract action against the insurer would impose the settlement procedures on the insurer even where the accident occurred before October 1, 1995. This is an untenable position, however. The phrase "cause of action" refers to the tort action. Logically, this is the only construction that is sound. Moreover, there is no indication that the legislature desired to give the statute a retroactive effect.... Finally, an interpretation that gives the statute a retroactive operation has constitutional implications.

Andrew Janquitto, *Maryland Motor Vehicle Insurance*, § 8.12.2, at 174 (Supp.1998) (footnotes omitted).

We are in complete accord with the view expressed in the passage quoted above.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**