REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 852

September Term, 2015

WESLEY HOSFORD

v.

CHATEAU FOGHORN LP

Kehoe,
Friedman,
Wilner, Alan M.,
     (Retired, Specially Assigned),
          JJ.

Opinion by Kehoe, J.

Filed: September 1, 2016

Wesley Hosford appeals from a judgment entered by the Circuit Court for Baltimore City in favor of Chateau Foghorn LP ("Foghorn"). Hosford presents three issues, which we have re-worded:

> 1. In an eviction action involving federally-subsidized housing, does federal law preempt the requirement in Maryland Annotated Code Real Property Article ("RP") § 8-402.1 that a court must conclude that a breach of a lease be "substantial" and "warrant eviction" before granting judgment for possession of the leased premises?
>
> 2. Was there sufficient evidence in the record to support the circuit court's conclusion that there was no genuine dispute of material fact that Hosford possessed marijuana in his apartment?
>
> 3. Does the possession of a small amount of marijuana for medical purposes constitute "drug-related criminal activity" in violation of the terms of Hosford's lease?

The circuit court answered the first question in the affirmative, but we reach the opposite conclusion. We will therefore reverse the judgment.

## Background

Foghorn owns and manages Ruscombe Gardens, a federally-subsidized apartment building in Baltimore. Hosford has resided there since 1989. Ruscombe Gardens' units are leased exclusively to elderly and disabled individuals. Hosford has been disabled by incomplete quadriparesis as the result of an accident in 1987.

In 2014, Foghorn hired an extermination company to treat Ruscombe Gardens for a bedbug infestation. Two exterminators entered Hosford's apartment and saw what looked to them like a marijuana plant growing in his bathtub. They reported this to the apartment's management office. Someone in the office contacted the police and Baltimore City Police Officer Phillip G. Tabron responded. Officer Tabron concluded

that the plant in the bathtub was marijuana, confiscated it, and issued Hosford a criminal citation for possession of marijuana. The plant was tested by a police chemist, who concluded that the plant was marijuana. Hosford was subsequently charged in the District Court for Baltimore City with possession of less than 10 grams of marijuana, but the charge was later nol prossed.

In July, 2014, Foghorn initiated an eviction action pursuant to RP § 8-402.1[1]

---

[1]Section 8-402.1 provides in pertinent part (emphasis added):

**Real Property Article § 8-402.1. Proceedings upon breach of lease.**

(a) Repossession of premises. — (1)(i) Where an unexpired lease for a stated term provides that the landlord may repossess the premises prior to the expiration of the stated term if the tenant breaches the lease, the landlord may make complaint in writing to the District Court of the county where the premises is located if:

1. The tenant breaches the lease;

2. A. The landlord has given the tenant 30 days' written notice that the tenant is in violation of the lease and the landlord desires to repossess the leased premises; [and]

. . . .

3. The tenant or person in actual possession of the premises refuses to comply.

(ii) The court shall summons immediately the tenant or person in possession to appear before the court on a day stated in the summons to show cause, if any, why restitution of the possession of the leased premises should not be made to the landlord.

. . . .

(3) If either of the parties fails to appear before the court on the day stated in the summons, the court may continue the case for not less than six nor more than 10 days and notify the parties of the continuance.

(b) Judgment for restitution of possession of premises. — (1) *If the court*

(continued...)

2

against Hosford in the district court, claiming that Hosford had breached the following term of his lease:

> The Landlord may terminate this Agreement for the following reasons:
>
>> [D]rug related criminal activity engaged in on or near the premises, by any tenant, household member, or guest, and any such activity engaged in on the premises by any other person under the tenant's control[.]

Hosford moved for a jury trial, claiming that the value of his right to continued occupation of his apartment exceeded $15,000.[2] After the case was transferred to the circuit court, Foghorn filed a motion for summary judgment, asserting that:

> 1. There was no genuine dispute of fact that appellant had marijuana in his apartment.
>
> 2. Possession of marijuana was illegal under Maryland law at the time of Hosford's arrest, and also illegal under federal law, and thus constituted drug-related criminal activity in violation of the lease.
>
> 3. Because Ruscombe Gardens was a federally-subsidized housing project, federal law vests discretion in landlords to decide whether a tenant should be evicted for

---

[1](...continued)
*determines that the tenant breached the terms of the lease and that the breach was substantial and warrants an eviction*, the court shall give judgment for the restitution of the possession of the premises and issue its warrant to the sheriff or a constable commanding the tenant to deliver possession to the landlord. . . .

[2]*See Cottman v. Princess Anne Villas*, 340 Md. 295, 297 (1995) and *Carroll v. Housing Opportunities Comm'n*, 306 Md. 515, 524–25 (1986) (For purposes of deciding whether the parties in an eviction action have the right to a jury trial, the amount in controversy is calculated by multiplying the yearly fair market rent by the number of years of the tenant's remaining life span if the lease automatically renews absent good cause to terminate.). Hosford's lease contains such a provision and Foghorn does not contest that application of this formula yields an amount in excess of $15,000.

3

drug-related criminal activity. These same laws preempt RP § 8-402.1's requirement that a court can order eviction only if the breach is substantial and warrants eviction.

From these premises, Foghorn argued that the only issue before the court was whether Hosford breached the lease. As to that issue, Foghorn asserted that there was no dispute of material fact as to whether Hosford possessed marijuana in his apartment and that his possession of it constituted a "drug-related criminal activity," in violation of the lease.

In response, Hosford claimed that there was a dispute of material fact as to whether the plant in his apartment was marijuana. Second, he contended that Foghorn was not entitled to summary judgment as a matter of law because: (a) if he did possess marijuana, it was not a criminal activity, and thus not a breach of the lease; and (b) even if the action did breach the lease, the court must still determine whether the breach was "substantial" and "warrants eviction" pursuant to RP § 8-402.1. Hosford also presented medical records indicating that he suffers from painful muscle spasms as a result of his physical condition, as well as an affidavit from an associate professor at The Johns Hopkins School of Medicine, stating that use of marijuana "is likely to provide . . . therapeutic or palliative relief" for persons suffering from chronic pain and muscle spasticity associated with quadriparesis.

On March 23, 2015, the circuit court granted Foghorn's motion for summary judgment. In its accompanying written opinion, the court first concluded that the

4

exterminators' affidavits and, most significantly, the police chemist's report, established there was no dispute of material fact that there was a marijuana plant in Hosford's apartment when the exterminators entered the apartment.

Second, the court was not persuaded by Hosford's arguments that the possession of the marijuana was not criminal. The court noted that, even though Maryland "no longer punishes the possession of less than ten grams of marijuana as a crime," the pertinent amendment to Maryland Code Criminal Law ("CL") Article § 5-601(c)(2)(ii)[3] became effective on October 1, 2014, that is, after the marijuana plant was discovered in Hosford's apartment.

The court then turned to Hosford's assertion that possession of marijuana in small amounts for medical purposes was not a criminal offense. The court stated that the statute

---

[3]CL § 5-601(c)(2)(ii) states:

(ii) 1. A first violation of finding of guilt under this section involving the use or possession of less than 10 grams of marijuana is a civil offense punishable by a fine not exceeding $100.

2. A second violation of finding of guilt under this section involving the use or possession of less than 10 grams of marijuana is a civil offense punishable by a fine not exceeding $250.

3. A third or subsequent violation of finding of guilt under this section involving the use or possession of less than 10 grams of marijuana is a civil offense punishable by a fine not exceeding $500.

. . . .

5

in question, CL § 5-601(c)(3)(iii)(1),[4] makes "medicinal use for a debilitating medical condition an affirmative defense." (Internal quotation marks omitted).

Acknowledging that no appellate court had yet addressed the operation and effect of the statute, the court reasoned that, based upon "the ordinary operation of affirmative defenses in criminal cases . . . a defendant successfully asserting the affirmative defense would escape conviction altogether." The court observed, however, that there is no corresponding affirmative medical marijuana defense in the federal Controlled Substances Act.[5] The court reasoned that, because "marijuana remains a federally prohibited Schedule I substance":

> [Foghorn] may proceed on the basis that the possession of any quantity of marijuana is a crime under federal law. Defendant Hosford's assertion of the medical use affirmative defense therefore would be irrelevant, *unless the jury is allowed to review the landlord's exercise of discretion in treating this particular possession of marijuana as warranting termination of the lease and eviction.*

---

[4]CL § 5-601(c)(3)(iii)(1) states:

In a prosecution for the use or possession of marijuana under this section, it is an affirmative defense that the defendant used or possessed marijuana because:

> A. the defendant has a debilitating medical condition that has been diagnosed by a physician with whom the defendant has a bona fide physician-patient relationship;

> B. the debilitating medical condition is severe and resistant to conventional medicine; and

> C. marijuana is likely to provide the defendant with therapeutic or palliative relief from the debilitating medical condition.

[5]*See* 21 U.S.C. Chapter 13, Part D.

6

(Emphasis added.)

The court then turned to whether "the jury is allowed to review the landlord's exercise of discretion in treating this particular possession of marijuana as warranting termination of the lease and eviction." The court decided that the answer to the question was "no." It stated:

> Federal law compels [Foghorn] to include in its leases for subsidized housing provisions that forbid tenants from engaging in or permitting any criminal drug activity on the premises and that give it the authority to evict a tenant for breaching that promise. *See Dep't of Housing and Urban Dev. v. Rucker*, 535 U.S. 125, 130-31 (2002). Although these terms are strict, the severity is tempered by federal regulations giving landlords some measure of discretion in deciding whether to seek eviction. *Id.* at 128-29. [Foghorn] argues that this federal law preempts RP § 8-402.1(b)(1) to the extent it vests in Maryland courts discretion to determine either that an alleged breach is substantial or that it warrants eviction.[6]

The court concluded "although federal law vests a landlord renting subsidized housing with discretion not to pursue eviction in all instances of criminal activity, *state courts* cannot be given discretion to overrule the landlord's exercise of discretion." (Emphasis in original). The circuit court relied upon three decisions, *Milwaukee City Housing Authority v. Cobb*, 361 Wis.2d 359 (2015); *Boston Housing Auth. v. Garcia*, 449 Mass. 727 (2007); and *Scarborough v. Winn Residential L.L.P./Atlantic Terrace*

---

[6]The circuit court cited *Brown v. Housing Opportunities Commission of Montgomery County*, 350 Md. 570, 576-84 (1998) and *Grady Management, Inc. v Epps*, 218 Md. App. 712 (2014), as cases dealing with the relationship between § 8-402.1 and federal regulations governing federally-subsidized housing. The circuit court concluded that neither case provided significant guidance. We will discuss both of these cases later in the opinion.

*Apts.*, 890 A.2d 249 (D.C. 2006). (We will discuss these cases, together with additional authorities, later in the opinion.)

Hosford filed a motion to alter or amend the judgment, which was denied. This appeal followed.

Analysis

We will reverse the judgment of the circuit court. As we will explain, RP § 8-402.1 grants to courts the authority to consider equitable and similar factors before granting a landlord's request for an eviction. In order for this portion of RP § 8-402.1 to be preempted by federal law, the exercise of such authority must cause "major damage" to "clear and substantial federal interests." Foghorn asserts that the federal interest at issue in this case is the right of a landlord, at its unfettered discretion, to evict a tenant if that tenant has been engaged in "drug-related criminal activity." Foghorn also argues that the circuit court's conclusion is fully supported by the authority cited in its opinion.

Foghorn's arguments are not persuasive. As we will explain, the relevant federal statute, its implementing regulations, and the pertinent Department of Housing and Urban Development ("HUD") guidelines, demonstrate that there are two closely-related federal interests at stake in this case. The first is that residents of federally-supported housing be protected against the effects of criminal activity in general, and drug-related criminal activity in particular. The second federal interest is that landlords have discretion to initiate eviction proceedings in such situations. Those same materials,

however, make it clear that a landlord may evict a tenant only by recourse to state or local landlord-tenant law and that those laws may provide the tenant with additional protections. The cases relied upon by the circuit court, *i.e., Cobb*, *Garcia*, and *Scarborough,* dealt with state statutes that are conceptually quite different from § 8-402.1. Our research has disclosed only one reported appellate opinion that has considered a preemption challenge to a state statute similar to § 8-402.1. That court concluded that the statute was not preempted.

## 1. The Standard of Review

A trial court's grant or denial of a motion for summary judgment is governed by Md. Rule 2-501. A grant of a motion for summary judgment is appropriate when "there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." Rule 2-501(f). "The purpose of the summary judgment procedure is not to try the case or to decide the factual disputes, but to decide whether there is an issue of fact, which is sufficiently material to be tried." *Jones v. Mid-Atl. Funding Co.*, 362 Md. 661, 675 (2001). "When ruling on a motion for summary judgment, a court must view the facts, including all inferences drawn therefrom, in the light most favorable to the opposing party." *Carter v. Aramark Sports & Entm't Servs., Inc.*, 153 Md. App. 210, 224 (2003).

Although we will reverse the judgment of the circuit court, we agree with some of its analysis. On the record before it, the circuit court did not err in deciding that there was

no dispute of material fact as to whether Hosford was in possession of marijuana on the day that his apartment was inspected. We also agree with the court that Maryland's decriminalization of possession of small amounts of marijuana does not change the fact that possession of any amount of marijuana is a violation of the federal Controlled Substances Act. However, we part company with the circuit court on the issue of preemption.

## 2. Preemption

"Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect."*Arizona v. United States*, 132 S. Ct. 2492, 2500 (2012). As a result, there is the potential for conflict or cross-purposes served by co-existing federal and state laws. *Id.* The Supremacy Clause[7] provides that federal law is supreme over state law and any state law that stands in conflict with the federal law is preempted.

There are three widely recognized forms of preemption: express, field, and conflict. *Farina v. Nokia Inc.*, 625 F.3d 97, 115 (3d Cir. 2010). Express preemption occurs when Congress has explicitly withdrawn "specified powers from the States by enacting a statute containing an express preemption provision." *Arizona*, 132 S. Ct. at

---

[7]Article VI, Clause 2 of the United States Constitution states in pertinent part:

This Constitution, and the Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

10

2500–01. Field preemption applies when "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Farina*, 625 F.3d at 115. Finally, conflict preemption applies either: "(1) 'where it is impossible for a private party to comply with both state and federal requirements,' or (2) 'where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* at 122 (quoting *Fellner v. Tri-Union Seafoods, L.L.C.*, 539 F.3d 237, 251 (3d Cir. 2008)).

The "ultimate touchstone" for determining whether federal law preempts state law is Congressional intent. *Id.* (quoting *Medtronic, Inc., v. Lohr*, 518 U.S. 470, 485 (1996)). In order to determine Congressional intent, courts start with the "basic assumption that Congress did not intend to displace state law." *Id.* at 116 (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)). "The presumption against inferring preemption is premised on federalism grounds and, therefore, weighs most heavily where the particular regulatory area is 'traditionally the domain of state law.'" *In re Tribune Co. Fraudulent Conveyance Litig.*, 818 F.3d. 98, 110 (2d Cir. 2016) (quoting *Hillman v. Maretta*, 133 S. Ct. 1943, 1950 (2013)). In instances where federal law regulates an area traditionally within the domain of state law, the state law must do "'major damage' to 'clear and substantial' federal interests before the Supremacy Clause will demand that state law will be overridden[.]" *Hillman*, 133 S. Ct. at 1950 (2013) (quoting *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 581 (1979)).

11

Agency regulations, with the force of federal law, can also preempt conflicting state and local laws. *Wyeth v. Levine*, 555 U.S. 555, 576 (2009). However, in such instances, courts do not necessarily accept the agency's conclusions but instead "perform[] [their] own conflict determination, relying on the substance of state and federal law and not on agency proclamations of pre-emption." *Id.* Federal agencies sometimes express views regarding preemption questions in ways that lack the formality of regulations, e.g., by compliance handbooks, other guidance materials, and commentaries on regulations. In these instances, courts have afforded some weight to the agency's explanation of its view, but no weight to its conclusion; as the Supreme Court explained in *Wyeth*, 555 U.S. at 576-77 (internal quotations and citations omitted; emphasis in original):

> In prior cases, we have given some weight to an agency's views about the impact of tort law on federal objectives when 'the subject matter is technical and the relevant history and background are complex and extensive. Even in such cases, however, we have not deferred to an agency's *conclusion* that state law is pre-empted. Rather, we have attended to an agency's explanation of how state law affects the regulatory scheme. While agencies have no special authority to pronounce on pre-emption absent delegation by Congress, they do have a unique understanding of the statutes they administer and an attendant ability to make informed determinations about how state requirements may pose an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. The weight we accord the agency's explanation of state law's impact on the federal scheme depends on its thoroughness, consistency, and persuasiveness.

The parties agree, as do we, that the concepts of express and field preemption are not applicable to this case. Turning to the doctrine of conflict preemption, Foghorn does

12

not assert that it is impossible to comply with both the state law and the federal law.

Moreover, landlord-tenant law is traditionally within the domain of state law, *see, e.g., Perry v. Hous. Auth. of City of Charleston*, 664 F.2d 1210, 1216 (4th Cir. 1981) ("It would be hard to find an area of the law in which the states have a greater interest or have had greater involvement than in the legal area of landlord-tenant."). As such, the disputed portions of RP § 8-402.1 are preempted only if they cause "'major damage' to 'clear and substantial'' federal interests" embedded in the federal law. This requires us to first identify the federal interests at issue and then to assess the degree to which a trial court's consideration of equitable and similar factors interferes with the federal government's ability to realize those interests. We will begin by considering the state and federal statute and regulations at issue.

### 3. The State and Federal Laws

### (A) RP § 8-402.1

RP § 8-402.1 provides a remedy to allow a landlord to obtain an order evicting a tenant for breaching a term of the lease other than a term calling for the payment of rent. *Brown v. Housing Opportunities Comm'n*, 350 Md. 570, 584 (1998).[8] In the present case, we are concerned with subsection (b)(1) of the statute, which states in pertinent part

---

[8]Section 8-402.1 is one of a trio of statutes enacted by the General Assembly to provide simplified court procedures by which landlords can recover possession of leased premises. The other two are RP § 8-401, which authorizes courts to order the eviction of tenants who have failed to pay rent and RP § 8-402, which established a similar remedy for tenants holding over. The historical and conceptual underpinnings of § 8-402.1 are discussed in detail in *Brown.* 350 Md. at 575–583.

13

(emphasis added):

> If the court determines that the tenant breached the terms of the lease and that *the breach was substantial and warrants an eviction*, the court shall give judgment for the restitution of the possession . . . .

The meaning of the italicized language was the focus of the Court's analysis in *Brown*. In tracing the evolution of § 8-402.1 from its common law roots, the Court noted that, prior to the enactment of the statute, one remedy for landlords seeking possession was a proceeding for ejectment, and that a tenant had the right to raise equitable defenses in such actions. *Id.* 582–83. As to the "breach was substantial and warrants eviction" language, the Court concluded:

> The inclusion of the phrase in question, conditioning a forfeiture on a finding that the breach in question warranted that relief, is in perfect harmony with those [equitable] considerations, even if it did, to some extent, vest in the District Court a more general discretion to preclude a forfeiture than previously had been exercised by the equity courts. *The court is entitled, and indeed directed, to weigh all of the relevant factors before declaring a forfeiture and evicting the tenant*, including the actual loss or damage caused by the violation at issue, the likelihood of future violations, and the existence of effective alternative remedies for past or existing violations.

*Id.* at 584 (emphasis added).

Thus, *Brown* held that the "warrants eviction" requirement authorizes a court to exercise its discretion before ordering eviction in a § 8-402.1 action. *Id.*

### (B) 42 U.S.C. § 1437f and 24 C.F.R. § 5.858

The federal statute in question is 42 U.S.C. § 1437f, which pertains to Section 8 project-based programs (such as Ruscombe Gardens). Section 1437f(d)(1)(B)(iii)

14

requires that tenant leases in such projects provide that engaging in drug-related criminal activity is grounds for termination of the lease:

> Contracts to make assistance payments entered into by a public housing agency with an owner of existing housing units shall provide (with respect to any unit) that—
>
> * * * *
>
> > (iii) during the term of the lease . . . any drug-related criminal activity on or near such premises, engaged in by a tenant of any unit, any member of the tenant's household, or any guest or other person under the tenant's control, shall be cause for termination of tenancy[.]

24 C.F.R. § 5.585 implements 42 U.S.C. § 1437f(d)(1)(B)(iii) as it relates to drug-related criminal activity. The regulation states in pertinent part:

> The lease must provide that drug-related criminal activity engaged in on or near the premises by any tenant, household member, or guest, and any such activity engaged in on the premises by any other person under the tenant's control, is grounds for you [i.e., the landlord] to terminate the tenancy. In addition, the lease must allow you to evict a family when you determine that a household member is illegally using a drug or when you determine that a pattern of illegal use of a drug interferes with the health, safety, or right to peaceful enjoyment of the premises by other residents.[9]

In *Department of Housing and Urban Development v. Rucker*, 535 U.S. 125, 129 (2002), the Court analyzed a substantively identical statute, 42 U.S.C. § 1437d(l)(6),[10]

---

[9]24 C.F.R. § 5.580 provides that § 5.585 applies to all federally-subsidized housing programs except for those specifically excepted in § 5.580. Ruscombe Gardens received projected-based funding from HUD and such projects are not excepted.

[10]42 U.S.C. § 1437d(l)(6) is the equivalent of 42 U.S.C. § 1437f(d)(1)(B)(iii) save that it applies to public housing program rather than project-based assistance projects such as Ruscombe Gardens. Specifically, 42 U.S.C. § 1437d(l)(6) states:

Each public housing agency shall utilize leases which—

(continued...)

15

and concluded that the statute:

> entrusts [the] decision [to evict] to the local public housing authorities, who are in the best position to take account of, among other things, the degree to which the housing project suffers from rampant drug-related or violent crime, the seriousness of the offending action, the extent to which the leaseholder has . . . taken all reasonable steps to prevent or mitigate the offending action.

*Id.* at 134 (quotation marks and citations omitted).

The issue, however, in *Rucker* was not preemption, but rather one of statutory construction, specifically, whether § 1437d authorized HUD to enact a regulation permitting landlords to evict "innocent tenants," that is, tenants whose family members or guests used illicit drugs in and about the apartment complex without the tenant's knowledge. *Id.* at 128. The Court answered the question in the affirmative. *Id.* at 130.

*Rucker* certainly stands for the proposition that permitting landlords discretion in deciding whether to evict tenants for illicit drug activity is an integral part of what is indisputably a "clear and substantial federal interest"—protecting residents of federally-supported housing from drug-related criminal activity. *Rucker* does not address in any fashion whether the exercise of discretion by state courts in eviction actions involving

---

[10](...continued)

> . . . .
>
> provide that any criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises by other tenants or any drug-related criminal activity on or off such premises, engaged in by a public housing tenant, any member of the tenant's household, or any guest or other person under the tenant's control, shall be cause for termination of tenancy[.]

16

federally-subsidized housing inflicts "major damage" to that interest.

To answer this question, both parties cite to a plethora of materials, including the federal regulation in question, 24 C.F.R. § 5.858, an interpretive document issued by HUD, namely, Handbook 4350.3—Occupancy Requirements of Subsidized Multifamily Housing Programs ("Handbook 4350.3"), which includes guidance on the application of C.F.R. § 5.858;[11] and case law in support of their respective positions on this issue. We will begin with some background.

4. A Guide Through the Labyrinth

(A) 42 U.S.C. § 1437f

Federally-subsidized housing first came into existence with the passage of the Housing Act of 1937 (the "Housing Act"). The Housing Act was passed in order to:

> [R]emedy the unsafe and insanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income, in rural or urban communities, that are injurious to the health, safety, and morals of the citizens of the Nation.

S. 1685, 75th Cong., 50 STAT. 888, 888 (1937).

The Department of Housing and Urban Development was established in 1965. Since then, HUD has developed several programs to provide assistance to low-income families in order to facilitate their ability to afford safe housing through the Housing

---

[11]HUD has several handbooks available online that were developed in order to provide guidance for different HUD Offices and programs. Handbook 4350.3 is one of several handbooks available on HUD's housing programs, and can be found at *https://perma.cc/96EY-DHFW*.

17

Act's authorization. *See* George Weidenfeller *et al.*, *Navigating HUD Programs, A Practitioners' Guide to the Labyrinth* xxix (2012). Each program is governed by its own, more or less discrete, body of law.[12] Ruscombe Gardens offers federally-subsidized housing to tenants through the Section 8 project-based program; specifically under the Section 8 State Housing Agency program, governed by 24 C.F.R. § 883 *et seq.*

Section 8 programs were established as part of the Housing and Community Development Act of 1974 (the "HCDA"). S. 3066, 93th Cong., 88 STAT. 633 (1974). Section 8 of the HCDA created a program to subsidize private rental housing. *Navigating HUD Programs* at 319. Section 8 is divided into two major categories: the tenant-based program and the project-based program. In the tenant-based program, HUD pays the difference between a contract rent and a specified percentage of a tenant's gross or adjusted income. In project-based assistance programs, like the one that subsidizes Ruscombe Gardens, HUD provides assistance to the housing projects rather than to individual households. *Id.* at 320.

The Housing Act was amended to include the current version of 42 U.S.C. § 1437d when Congress enacted the Anti-Drug Abuse Act of 1988 (the "ADAA"). The subchapter pertaining to public housing projects, entitled the Public Housing Drug Elimination Act of 1988, contained the following findings of Congress:

---

[12]The HUD regulations for other programs contain provisions similar to 24 C.F.R. § 5.858's requirement that leases contain a provision providing grounds to evict for drug-related criminal activity. *See, e.g.,* 24 C.F.R. § 882.511; 24 C.F.R. § 982.553; 24 C.F.R. § 966.4.

The Congress finds that—

(1) the Federal Government has a duty to provide public housing that is decent, safe, and free from illegal drugs;

(2) public housing projects in many areas suffer from rampant drug-related crime;

(3) drug dealers are increasingly imposing a reign of terror on public housing tenants;

(4) the increase in drug-related crime not only leads to murders, muggings, and other forms of violence against tenants, but also to a deterioration of the physical environment that requires substantial governmental expenditures; and

(5) local law enforcement authorities often lack the resources to deal with the drug problem in public housing, particularly in light of the recent reductions in Federal aid to cities.

H.R. 5210, 100th Cong., 102 STAT. 4295, 4301 (1988).

Accordingly, Congress revised 42 U.S.C. § 1437d to include the following provision:

Each public housing agency shall utilize leases which—

. . .

provide that any criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises by other tenants or any drug-related criminal activity on or off such premises, engaged in by a public housing tenant, any member of the tenant's household, or any guest or other person under the tenant's control, shall be cause for termination of tenancy;

42 U.S.C. § 1437d(l)(6); *see also* 102 STAT. at 4300.

The ADAA addressed drug-related criminal activity as grounds for eviction only in the context of public housing programs. In 1998, Congress passed the Quality Housing and Work Responsibility Act (the "QHWRA"), which extended this statutory

19

requirement to Section 8 programs like Ruscombe Gardens.

The QHWRA was the most comprehensive reform of the Housing Act since the HCDA. *Navigating HUD Programs* at 286. Subtitle F of that statute addressed safety and security problems in public and assisted housing. The current version of the statute governing Foghorn's lease—42 U.S.C. § 1437f(d)(1)(B)(iii)—was contained in § 577 of the QHWRA.

The Congressional findings for the QHWRA did not explain why it chose to expand the ADAA to Section 8 programs, but did explain that one of the goals of the Act was to provide public housing authorities with greater discretion over federally-subsidized housing. *See* H.R. 4194, 105th Cong., 112 STAT. 2518, 2521 (1998) ("[T]he purpose served by the [QHWRA] was to: . . . deregulat[e] and decontrol[] public housing agencies, thereby enabling them to perform as property and asset managers.")

(B) The Agency's Views of Preemption

Foghorn directs us to two sources which it asserts demonstrate HUD's intention for the federal law to preempt state laws such as the disputed portions of RP § 8-402.1: HUD's Handbook 4350.3 and the preamble to 24 C.F.R. § 5.850 *et seq*. There are some difficulties with Foghorn's argument. First, we note that, as we stated *supra*, even if Handbook 4350.3 or the preamble to the regulations expressed HUD's intent to preempt state law, the agency's views would only provide persuasive authority for our conflict determination, and the persuasive weight of that authority would depend on the

"thoroughness, consistency, and persuasiveness" of HUD's statements concerning preemption. *See Wyeth*, 555 U.S. at 577. Second, neither Handbook 4350.3 nor the preamble to 24 C.F.R. § 5.850 *et seq.* expresses an intent to preempt state laws such as the disputed provisions of RP § 8-402.1.

We begin with Handbook 4350.3. Foghorn directs us to the section of the Handbook that discusses procedures for judicial actions to evict a tenant of federally-subsidized housing, which states:

> Judicial action.
>> a. An owner must not evict any tenant except by judicial action
>> pursuant to state and local laws.
>> . . . .
>> d. A tenant may rely on state or local laws governing eviction
>> procedures where such laws provide the tenant procedural rights that
>> are in addition to those provided by the regulatory agreements,
>> except where such laws have been preempted under CFR Part 246,
>> Local Rent Control, or by other action of the United States.

Handbook 4350.3 at 8-16–17.

Foghorn overlooks the seemingly clear language in subsection a. and the first clause in subsection d. Focusing instead on the second clause in subsection d., Foghorn argues that HUD intended to preempt state laws that are incongruent with 42 U.S.C. § 1437f and 24 C.F.R. § 5.858 because subsection d. explicitly references the preemption of state laws. However, neither 42 U.S.C. § 1437f nor 24 C.F.R. § 5.858 mentions the preemption of state or local eviction procedures. This is problematic (from Foghorn's perspective), because HUD's example of an "action of the United States" is 24 C.F.R.

Part 246. The introduction to that regulation describes the scope of Part 246:

> The regulation of rents for a project coming within the scope of 'Subpart B—Unsubsidized Insured Projects' is preempted under these regulations *only when the Department determines that the delay or decision of the local rent control board . . . jeopardizes the Department's economic interest* in a project covered by that subpart. The regulation of rents for projects coming within the scope of 'Subpart C—Subsidized Insured Projects' *is preempted in its entirety by the promulgation of these regulations*. The regulation of rents for projects coming within the scope of 'Subpart D—HUD–Owned Projects' *rests within the exclusive jurisdiction of the Department*.

24 C.F.R. § 246.1(a) (emphasis added).

The preemption language in 24 C.F.R. § 246.1(a) is explicit. It suggests to us that, when HUD used the term "other action of the United States" in Handbook 4350.3, the Department was referring to actions by the federal government that clearly and unmistakably indicate that state or local law is preempted. Nothing in the Federal Housing Act explicitly preempts state and local landlord-tenant laws; and nothing in 24 C.F.R. § 5.850 *et seq.* expresses an explicit intent to preempt state or local laws concerning eviction procedures. The only other "action of the United States" to which Foghorn directs our attention is a passage from the preamble to HUD's adoption of 24 C.F.R. § 5.850 *et seq.*

The preamble is an introductory statement prepared by HUD's Office of the Secretary (the "Office"), which contains information on the final rule such as a summary of the rule, the effective date of the rule, and other supplementary information on the

22

rule.[13] 66 Fed. Reg. 28776 (May 24, 2001). What is of particular interest to us is a portion of the preamble to 24 C.F.R. § 5.850 and related regulations that discuss proposed amendments to the regulations which were received by HUD during the public comment period. Foghorn places special significance on a portion of HUD's response to one comment, arguing that it reveals HUD's intent to sharply limit the role of state courts in eviction proceedings.

The commenter, a legal services organization, recommended that HUD modify its proposed regulations for lease provision requirements in order to:

> [P]reserv[e] for [public housing authorities] (*and add[] for courts*) 'discretion to consider all of the circumstances of the case, including the seriousness of the offense, the extent of participation by family members, and the effects that the eviction would have on family members not involved in the proscribed activity.'

*Id.* at 28782 (emphasis added).

In response, the Office wrote:

> [T]he final rule allows the necessary flexibility for [public housing authorities] with respect to public housing and owners with respect to project-based assistance and tenant-based assistance. This is consistent with the cited committee report language, which in any event has not been reflected in any statute. The committee report language for both the House and Senate versions of the [QHWRA] emphasizes efforts to make assisted housing safer for residents, which is consistent with the final rule.
> *The statute* does not authorize courts to exercise the same type of discretion. Courts determine whether a violation of the lease has occurred

---

[13]More information on the federal rule-making process can be found in *A Guide to the Rulemaking Process*, OFFICE OF THE FEDERAL REGISTER,, *available at* https://perma.cc/SKB8-5JVM.

and whether the lease provides that such a violation is grounds for eviction of the persons whom the [public housing authority] seeks to evict. . . . [I]t is important to recognize that . . . a court's function *under HUD's regulations* is to determine whether an eviction meets the requirements of the lease . . . *and not whether a [public housing authority] has considered additional social and situational factors that HUD's regulations authorize, but do not require, a [public housing authority] to consider* in making its decision whether or not to pursue eviction of any family or individual whom, under the lease, the [public housing authority] has the legal right to evict.

*Id.* (emphasis added).

Based on this language, Foghorn argues that HUD clearly intended to restrict State courts' role in eviction actions to determining whether a tenant of federally-subsidized housing breached the lease. But HUD's response cannot be read in a vacuum; it was written in response to a comment, and must be considered in that context.

The commenter suggested that HUD should modify *the regulation* in order to enable State courts to consider "all of the circumstances of the case" before ordering an eviction. In response, the Office explained that it would not implement this recommendation because HUD's authority to enact the regulations derived from the governing statute, i.e., the QHWRA, and the statute does not provide courts with authority to exercise discretion over eviction actions for tenants of federally-subsidized housing. The Office's conclusion is not surprising because landlord-tenant law has traditionally been considered a matter of state law.[14] There is certainly nothing in §

---

[14]*See Perry v. Hous. Auth. of City of Charleston*, 664 F.2d at 1216 ("It would be hard to find an area of the law in which the states have a greater interest or have had

(continued...)

1437f, or anywhere else in either the QHWRA, or elsewhere in the Housing Act or any of its numerous amendments, that suggests that Congress intended to give HUD the authority to put into effect a nationwide landlord-tenant code for federally-supported housing.

The Office further explained that, as far as *the HUD regulations* were concerned, the courts' role is limited to determining whether a tenant has breached the lease and that courts do not have the authority to decide "whether a [landlord] has considered additional social and situational factors that HUD's regulations authorize, but do not require[.]"

The Office's response to the comment makes it clear that a state court could not, as a prerequisite to ordering eviction, consider whether a landlord's decision to initiate eviction proceedings was consistent with HUD guidelines. This conclusion reflects the Supreme Court's interpretation of 42 U.S.C. § 1437d, which pertains to public housing authorities, as opposed to Section 8 programs. *See Rucker.* 535 U.S. at 134 (The Housing Act "entrusts [the] decision [to evict] to the local public housing authorities[.]"). But deciding whether a landlord's decision to seek eviction is consistent with *federal* policy is one thing; deciding whether eviction is appropriate based upon considerations of

---

[14](...continued)
greater involvement than in the legal area of landlord-tenant."); *Forest City Residential Mgmt., Inc. ex rel. Plymouth Square Ltd. Dividend Hous. Ass'n v. Beasley*, 71 F. Supp. 3d 715, 732 (E.D. Mich. 2014) ("[S]tate courts have jurisdiction to determine whether, and under what circumstances, a landlord may evict a tenant for violation of lease provisions.")

equity or other principles arising out of *state* law is quite another. The 2001 preamble does not purport to address the authority of state courts to exercise discretion pursuant to state statutory or common law.

Our analysis of the statute, the implementing regulations, and the HUD guidelines, lead us to two conclusions:

*First*, a landlord does not have to consider equitable factors in determining whether to pursue eviction for drug-related conduct. A state law that would require landlords to do so would be preempted.

*Second*, a landlord cannot effect an eviction by itself—it must go to court and obtain a judgment entered in accordance with non-pre-empted state law.

To be sure, had it wished to do so, Congress could have required state courts to order evictions upon a finding of a breach of the lease due to drug-related activity. Congress did not do so and the reason is not difficult to discern. A Congressional mandate that state courts rubber-stamp a landlord's decision, without considering otherwise applicable equitable factors arising from state law, would intrude upon not only the concept of comity that is the cornerstone of our federal system of government but also upon the functioning of the judiciary as an independent branch of government.[15]

---

[15]*See, e.g., Arizona v. United States*, 132 S. Ct. at 2500 ("Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect."); *Chadha v. Immigration & Naturalization Serv.*, 634 F.2d 408, 425 (9th Cir. 1980), *aff'd sub nom. I.N.S. v. Chadha*, 462 U.S. 919 (1983) ("[W]e define a constitutional violation of the separation of powers

(continued...)

Moreover, a state law that allows the court to consider equitable factors is, in our view, consistent with the basic purpose of the Section 8 program itself, that is, providing decent housing for a class of people who otherwise would not have it. To require a state court, *as a matter of law*, to evict a disabled member of that class out of the home he had resided in for 24-25 years for having one marijuana plant in his bathtub, for his own medical use, with no evidence of distribution or attempted distribution, furthers no Congressional intent that we have been able to identify.

### 5. Cases from Other Jurisdictions

As we mentioned earlier, in concluding that judicial exercise of discretion under RP § 8-402.1(b)(1) was preempted by federal law, the circuit court relied upon several decisions from other jurisdictions. The parties have cited others as well. The cases fall into several categories.

The first group is represented by *Scarborough v. Winn Residential L.L.P./Atlantic Terrace Apts.*, 890 A.2d 249 (D. C. 2006); *Milwaukee City Hous. Auth. v. Cobb,* 361 Wis.2d. 359 (2015); and *Housing Authority of Covington v. Turner*, 295 S.W.3d 123 (Ky. Ct. App. 2009). These cases involve state or local "right-to-cure" provisions, i.e., statutes that do not permit eviction unless the landlord first provides the tenant with an

---

[15](...continued)
as an assumption by one branch of powers that are central or essential to the operation of a coordinate branch, provided also that the assumption disrupts the coordinate branch in the performance of its duties and is unnecessary to implement a legitimate policy of the Government.")

opportunity to "cure" the violation within a reasonable time. The results in these decisions are split; *Scarborough* and *Cobb* concluded that the right-to-cure statute provisions *did* frustrate Congress's goal of ensuring that federally-subsidized housing complexes remain drug-free and safe places to live, while *Turner* concluded that the state law did not frustrate this goal.

The reasoning in the former cases largely rested on the courts' conclusion that allowing a mandatory second-strike policy for a tenant's drug use interfered with landlords' ability to exercise their discretion to evict tenants for drug use or other criminal conduct. *See Scarborough*, 890 A.2d at 256 ("[T]he cure opportunity provided by [the State law] . . . would substitute for the landlord's discretion a mandatory second-strike opportunity for a tenant to stay eviction by discontinuing, or not repeating, the criminal act during the thirty days following notice."); *Cobb*, 361 Wis.2d at 379 ("[A] right to cure past illegal drug activity is in conflict with Congress' method of achieving [its] goal by allowing eviction of tenants who engage in drug-related criminal activity."). In contrast, the Court in *Turner* concluded that providing tenants with an opportunity to cure their violation would not run afoul of legislative intent because "a tenant who has been served with notice of the intent to evict has clear knowledge of the provision, and having been given the opportunity to remedy may be among the most likely of tenants to prevent the situation from recurring, thereby furthering the purposes of and objectives of the law." 295 S.W.3d at 127.

The second category of cases is represented by *Boston Hous. Auth. v. Garcia*, 449 Mass. 727 (2007). That case involved a provision in the Massachusetts landlord-tenant law that "provides relief from termination when special circumstances indicate that the tenant could not have foreseen the misconduct or was unable to prevent it by any available means, including outside help[.]" *Id.* at 728. The Supreme Judicial Court characterized the statute as establishing an "innocent tenant defense." *Id*. at 729. Relying largely on *Department of Housing and Urban Development v. Rucker*, 535 U.S. 125 (2002), the Massachusetts court concluded that federal law preempted the Massachusetts statutes that established the innocent tenant defense in eviction proceedings when the lease violation involved drug-related criminal activity. 447 Mass. at 734.

The cases that fall into these categories are not particularly helpful in resolving the issues before us. The right-to-cure statutes at issue in *Scarborough, Turner* and *Cobb* gave the *tenant* the unilateral right to delay a landlord's discretion to evict regardless of the actual or potential effects of the tenant's behavior upon other residents. The "innocent tenant" defense that was at issue in *Garcia* had been clearly identified in by the Supreme Court in *Rucker* as conflicting with federal housing policy.

The third category of cases consists of *Eastern Carolina Regional Housing Authority v. Lofton*, 767 S.E.2d 63 (N.C. App. 2014), *aff'd on other grounds*, ___ S.E.2d ___, 2016 WL 4410714 (N.C. Aug. 19, 2016). This case involved a preemption challenge to a North Carolina law that authorized courts to rule in a landlord's favor only

29

if "enforcing the forfeiture is not unconscionable." 767 S.E.2d at 67. The North Carolina Court of Appeals concluded that permitting a court to exercise this discretion would not frustrate the federal law's goals and purposes. In reaching its conclusion, *Lofton* noted that the federal law does not *require* the eviction of tenants for engaging in drug-related criminal activity, but provides landlords with the discretion to decide whether to evict such a tenant. *Id.* at 70–71. As such, the Court concluded that:

> [G]iven this emphasis on the need for local housing authorities to make individualized eviction determinations and the absence of evidence tending to show the existence of any sort of *per se* eviction requirement in the relevant statutory provisions or administrative rules, we are unable to see how North Carolina's unconscionability requirement stands as an obstacle to the accomplishment and execution . . . of the established federal policy of ensuring the availability of federally assisted low-income housing that is decent, safe, and free from illegal drugs.

*Id.*

The Court further noted that this conclusion was not contrary to the holding in *Rucker* that the federal law authorizes the eviction of innocent tenants because courts are capable of determining when, in some instances, it would be appropriate to evict an "innocent tenant" (such as a tenant that refuses to cooperate with any subsequent investigation into the drug-related criminal activity in question), and where, in other instances, it would be unconscionable to evict a tenant for the breach. *Id.* at 71. Thus the Court concluded that the federal law and state law were not in conflict. *Id.*

Although we acknowledge that *Lofton* hardly represents a tidal wave of authority, particularly as the decision was affirmed on a different ground by the Supreme Court of

30

North Carolina,[16] we agree with the reasoning of our colleagues on the North Carolina intermediate appellate court. We conclude that a state court's consideration of equitable and related factors in an eviction action does not stand as an obstacle to the federal goal of providing low-income housing that is decent, safe, and free from illegal drugs. Moreover, as we have previously discussed, there is nothing in the federal statute or HUD regulations or guidelines that suggests a court's consideration of equitable factors pursuant to RP § 8-402.1 is preempted by federal law.

Our conclusion is also consistent with this Court's holding in *Grady Management, Inc. v. Epps*, 218 Md. App. 712, 735 (2014). *Grady* also involved a landlord-tenant action wherein the tenant resided in federally-subsidized housing under the Section 8 program. *Id.* at 723. At issue in that case was the interplay between the federal requirement that a landlord may only decline to renew a tenant's lease for federally-subsidized housing for "good cause," *see id.* at 731,[17] and Maryland's statutes concerning

---

[16]The Supreme Court of North Carolina affirmed the decision on the Court of Appeals in *Lofton*, but for reasons that are not relevant to the issues raised in the case before us. The North Carolina Supreme Court did not address preemption in its opinion. The Court held that the state's summary ejectment statute did not grant courts the authority to deny an ejectment petition on equitable grounds. 2016 WL 4410714 at *3. That notwithstanding, the Court held that federal law required public housing authorities to exercise discretion before initiating an eviction for drug-related activity involving an innocent tenant, *id*. at *4, and the trial court had properly denied the eviction petition because the evidence indicated that Lofton's landlord had not exercised discretion. *Id.* at *5.

[17]This "good cause" standard for refusing to renew a lease of a tenant of federally-subsidized housing was adopted by an earlier decision of the Court of Appeals—

(continued...)

31

terminating a lease—RP § 8-402.1 for lease breaches and RP § 8-402 for tenants' unlawful holding over. Specifically, the Court examined whether a claimed breach of lease that did not "warrant eviction" pursuant to RP § 8-402.1 was sufficient to constitute "other good cause" to decline to renew the lease for a tenant occupying federally-subsidized housing. *Id.* at 733.

This Court concluded that it was not; it reasoned that the same standard—i.e., that the breach of lease must "warrant eviction" was equally applicable regardless of whether a landlord pursued an eviction action for breach of lease pursuant to RP § 8-402.1 or at the end of the lease term for "good cause." *Id.* at 733-34. We reasoned that this conclusion was consistent with both State and federal law because, pursuant to the federally required lease terms, "*any* termination . . . must be carried out in accordance with HUD regulations, State and local law, and the terms of this Agreement." *Id.* at 734 (emphasis in original). Thus, this Court concluded that: "The requirement of R.P. § 8-402.1 that a claimed 'breach' must 'warrant[] an eviction' does not, in our view, impose on a landlord seeking to terminate a project-based subsidized lease a 'more stringent' demonstration of good cause than necessary." *Id.* Similarly, in this case, we conclude that permitting State courts to exercise discretion and consider equitable factors when deciding whether to rule in a landlord's favor in an eviction action concerning federally-subsidized housing is consistent with federal law and policy.

---

[17](...continued)
*Carter v. Maryland Management Co.*, 377 Md. 596 (2003).

6. Recapitulation

In summary, Foghorn's preemption arguments must be weighed against a presumption against preemption that "weighs most heavily where the particular regulatory area is traditionally the domain of state law." *In re Tribune Co. Fraudulent Conveyance Litig.*, 818 F.3d. at 110. In order to overcome that presumption, Foghorn must (1) identify a clear and substantial federal interest embedded in 42 U.S.C. § 1437f(d)(1)(B)(iii), and (2) show that a Maryland court's exercise of discretion pursuant to RP § 8-402.1 does "major damage" to that interest. *Hillman*, 133 S. Ct. at 1950.

We have identified two clear and substantial federal interests raised by the mandatory lease provisions in 42 U.S.C. § 1437f(d)(1)(B)(iii): (1) ensuring that federally-subsidized housing remains a safe and drug-free environment; and (2) preserving a landlord's ability to initiate eviction actions against tenants that threaten the former goal. Foghorn has directed us to no authority that indicates that either federal interest is caused major damage by the disputed portions of RP § 8-402.1 The regulations and HUD's policy statements on the issue do not indicate that the agency itself has concluded that allowing courts in eviction proceedings to consider equitable factors conflicts with the Congressional goals. Furthermore, as we have explained, we agree with our North Carolina colleagues that exercise of discretion on the part of a trial court in an eviction action *is not* preempted by the federal law.

We believe that courts can strike the proper balance between federal policy and

state law by presuming that drug-related criminal activity is a breach that *ordinarily* warrants eviction under RP § 8-402(b)(1), but that this presumption may be rebutted by equitable factors that arise in a given case. This approach gives proper weight both to the exercise of the landlord's discretion accorded under federal law to seek eviction, and to Maryland's public policy, embodied in RP § 8-402.1(b), that tenants—especially impoverished and disabled ones—not be evicted automatically when good reasons are presented and credited to show that such eviction would be not only unduly harsh but not necessary to accommodate the Federal objectives.[18]

Accordingly, we reverse the judgment of the circuit court and remand this case for trial.[19]

---

[18]In its opinion, the circuit court noted that:

> Both parties have assumed that all questions under RP § 8-402.1 (b)(1) would be put to the jury. This Court is not so certain of that assumption. In another case, even if the tenant were entitled to a jury trial, by virtue of the value of the remaining tenancy, the question whether a particular breach warrants eviction might be considered an equitable issue as to which there is not a jury trial right.

The circuit court did not reach this issue because it concluded that any exercise of discretion was preempted. We will not address the issue. *See* Md. Rule 8-131(a) (An appellate court generally does not address matters not raised to, or decided by, the trial court.)

[19]In his brief, Hosford asserts that the court and police records pertaining to these charges were expunged in September, 2015, that is, after the circuit court entered judgment in Foghorn's favor in this action. He argues that the effect of the expungement renders the police records inadmissible as evidence in the eviction case. Foghorn responds that the order of expungement is not in the record and Hosford's argument was never considered by the circuit court.

(continued...)

34

**THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY IS REVERSED AND THIS CASE IS REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. APPELLEE TO PAY COSTS.**

---

[19](...continued)
We do not generally consider arguments that were not presented to the circuit court *See* Md. Rule 8-131(a). Moreover, Foghorn is correct that the purported expungement order is not part of the record. Accordingly, we will not address Hosford's expungement contentions in deciding this appeal. *See Mora v. State*, 355 Md. 639, 650 (1999).

With that said, nothing prevents Hosford from raising the issue on remand.