**Kathy A. Netro, Personal**

*Representative of the Estate of Barbara Bromwell, deceased v. Greater Baltimore Medical Center, Inc.,* **No. 1990.16**

**Damages:** Under Maryland law, assuming other conditions are met, a plaintiff who brings a negligence action is allowed to put into evidence the bill submitted by his/her healthcare provider and the defendant is prohibited from bringing to the attention of the jury the fact that a portion of the bill has been written-off by the healthcare provider. *See Lockshin v. Semsker,* 412 Md. 257, 284-285 (2010). Nevertheless, pursuant to Maryland Code (1974, 2016 Repl., Vol.), Courts & Judicial Proceedings Article § 3-2A-09 ("the Maryland Act"), a defendant against whom a verdict for past medical expenses has been entered may file a post-trial motion to reduce the judgment by the amount of the write-offs. *Id.* 285-86.

In 1980, the United States Congress passed the Secondary Payer Act ("SPA"), which provides, *inter alia*, that when Medicare makes a conditional payment to the covered individual for medical bills, Medicare has a right to recover the monies advanced from either the beneficiary, the tort feasor (if self-insured) or from the tort feasor's insurer if a judgment for at least the amount of the medical bill is later entered in favor of the beneficiary. No provisions in the SPA preempts any part of the Maryland Act.

Circuit Court for Baltimore County
03-C-14-009164

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1990

September Term, 2016

_____

KATHY A. NETRO, ET AL.

V.

GREATER BALTIMORE MEDICAL
CENTER, INC.
_____

Kehoe,
Reed,
Salmon, James P.
        (Senior Judge, Specially Assigned),


JJ.
_____

Opinion by Salmon, J.
_____

Filed:  July 5, 2018

Most people in the United States who receive medical services have their medical costs paid, at least in part, by private health insurers or a government insurer such as Medicare. When the health care providers send their bills to the patient's private or government health insurer, those insurers very frequently do not pay 100 percent of what the medical care providers charge; instead, they pay a reduced amount and the difference between the amount charged and the amount paid is often written off by the health care providers. Under Maryland law, assuming other conditions are met, a plaintiff who brings a negligence action is allowed to put into evidence the bill submitted by the health care provider and the defendant is prohibited from bringing to the attention of the jury the fact that a portion of the bill has been written-off. *See Lockshin v. Semsker*, 412 Md. 257, 284-85 (2010). Nevertheless, as a result of Maryland Code (1974, 2013 Repl. Vol.), Courts and Judicial Proceedings Article (Cts. & Jud. Proc.) § 3-2A-09 (hereinafter "the Maryland Act"), a defendant against whom a verdict for past medical expenses has been entered may file a post-trial motion to reduce the judgment by the amount of the write-offs. *Lockshin*, 412 Md. at 285-86.[1] The Maryland Act provides, in pertinent part:

---

[1] In *Lockshin*, 412 Md. at 286, the court explained the reasons that write-offs should not be considered by the jury:

> If it is for the jury to consider write-offs and reduce their verdict accordingly, it will be necessary for a defendant to introduce evidence to the jury of the actual payments made by the plaintiff's health insurers or other collateral sources. As noted *supra*, such evidence contravenes the collateral source doctrine. Adopting this interpretation would require reading § 3-2A-09(d), as the Circuit Court did here, as fashioning a legislative exception on the collateral source rule, despite the statute's omission of any reference to that rule. Alternatively, if evidence of write-offs and discounts by the plaintiff's
>
> (continued . . .)

(d) Medical expenses . . .

   (1) A verdict for past medical expenses shall be limited to:

     (i)    The total amount of past medical expenses paid by or on behalf of the plaintiff; and

     (ii)   The total amount of past medical expenses incurred but not paid by or on behalf of the plaintiff for which the plaintiff or another person on behalf of the plaintiff is obligated to pay.

Cts. & Jud. Proc. § 3-2A-09(d)(1).

The obvious intent of the Maryland Act was to prevent the victim of a tort from recovering a verdict for past medical expenses that neither the plaintiff, nor anyone acting on the plaintiff's behalf, ever paid or was obligated to pay. In other words, insofar as past medical expenses are concerned, the Maryland General Assembly wanted to prevent the plaintiff from receiving a windfall by recovering for medical bills that were never actually incurred.

---

(. . . continued)

health care providers is to be presented to the court in a post-verdict remittitur setting, similar to the procedures found in [Cts. & Jud. Proc.] §§ 3-2A-05(h) and 3-2A-09(c), the collateral source doctrine is not implicated or violated. Under this interpretation, the collateral source rule and § 3-2A-09 may be harmonized such that collateral source evidence of write-offs and discounts is not presented to the jury, but to the court, after the jury has rendered its verdict. Compelled by our duties to harmonize statutory language wherever possible and avoid repeal of the common law by implication, we embrace the latter interpretation as most consistent with the legislative intent and principles of statutory interpretation.

In the case *sub judice*, the Circuit Court for Baltimore County applied the Maryland Act based on the following undisputed facts. Barbara Bromwell, between June 1, 2011 and June 29, 2013, received medical bills from various health care providers that totaled $451,956.00. At the time she received those bills, she was eligible to receive Medicare benefits as well as benefits from CareFirst BlueCross BlueShield (hereinafter "CareFirst"), her private health care insurer. Medicare made conditional payments to Ms. Bromwell of $157,730.75; CareFirst also paid part of the bills that were submitted, and Ms. Bromwell and/or her personal representative paid $47,609.00 in out-of-pocket expenses. But, taking into consideration $62,941.70 in write-offs, by Medicare and CareFirst, the total amount Ms. Bromwell, or her insurers or anyone else either paid, or were obligated to pay, was $389,014.30 ($451,956.00 - $62,941.70).

After Ms. Bromwell's death, Kathy Netro, personal representative of the estate of Barbara Bromwell, filed a survival action in the Circuit Court for Baltimore County against Greater Baltimore Medical Center (hereinafter "GBMC") and others.[2] When that case was tried before a jury, the personal representative proved that $451,956.00 worth of medical bills were sent to Ms. Bromwell (or her representative) as a result of the medical malpractice committed by GBMC. On July 22, 2016, the jury returned a verdict against GBMC and in favor of the personal representative for past medical expenses in the amount of $451,956.00. The jury found, however, that GBMC's negligence did not cause the death

---

[2] Two other defendants were sued but found by a jury not to be liable for Ms. Bromwell's injuries.

3

of Ms. Bromwell and for that reason it rejected the wrongful death claims brought against GBMC by Ms. Bromwell's three surviving adult children. Additionally, the jury awarded zero dollars in regard to the personal representative's claim for non-economic damages. After judgment was entered on July 22, 2016, in conformity with the jury verdicts, the personal representative along with Ms. Bromwell's surviving children, on August 1, 2016, filed a motion for new trial or, in the alternative, an *additur*.

On August 2, 2016, which was eleven days after the judgment was entered, GBMC filed a motion to "reduce verdict/judgment" pursuant to the Maryland Act. The trial court denied plaintiffs' motion for new trial or, in the alternative, an *additur* on August 23, 2016.

Meanwhile, the personal representative of Ms. Bromwell's estate filed an opposition to GBMC's motion to reduce the verdict/judgment. The personal representative contended that provisions set forth in the Medicare Secondary Payer Act (hereinafter "the MSP"), a federal law, preempted the Maryland Act because, if the provisions of the Maryland Act did not exist, Medicare would receive approximately $18,500.00 more in repayment of the $157,730.75 conditionally paid by Medicare, than it would receive if the Maryland Act was enforced. Her preemption argument is based on regulations that are set forth in 42 C.F.R. (Code of Federal Regulations) § 411.37, which govern how the MSP should be implemented. Section 411.37 reads, in pertinent part:

> (a) Recovery against the party that received payment—
>
> > (1) General Rule. Medicare reduces its recovery to take account of the cost of procuring the judgment or settlement, as provided in this section, if—

(i) Procurement costs are incurred because the claim is disputed; and

(ii) Those costs are borne by the party against which CMS [Centers for Medicare and Medicaid Services] seeks to recover.

\* \* \*

(c) Medicare payments are less than the judgment or settlement amount. If Medicare payments are less than the judgment or settlement amount, the recovery is computed as follows:

(1) Determine the ratio of the procurement costs to the total judgment or settlement payment.

(2) Apply the ratio to the Medicare payment. The product is the Medicare share of procurement costs.

(3) Subtract the Medicare share of procurement costs from the Medicare payments. The remainder is the Medicare recovery amount.

To illustrate how C.F.R. § 411.37(c) operates, consider the following hypothetical: A plaintiff incurs $100,000.00 in procurement costs (legal fees, bills from experts and other costs) in order to obtain a $500,000.00 verdict for past medical expenses in a negligence case in which Medicare has made conditional payments of $250,000.00. In that hypothetical, Medicare's pro rata share of the procurement costs would be 50% of $100,000.00 or $50,000.00. But, if the total judgment is reduced from $500,000.00 to $400,000.00 for some reason, such as implementing the Maryland Act, Medicare's pro rata share of the procurement costs would be 62.5% ($250,000.00 is 62.5% of $400,000.00) and Medicare would have to pay $62,500.00 toward the procurement costs rather than $50,000.00.

If, in the case *sub judice*, the judgment stayed at $451,956.00, Medicare would only have to pay about 34.90% of the procurement costs because $157,730.75 is approximately 34.90% of $451,956.00.  But, if the judgment were reduced pursuant to the Maryland Act, Medicare would have to pay approximately 40.55% of the fixed procurement costs inasmuch as $157,730.75 is about 40.55% of $389,014.30.  That higher pro rata share means, according to appellant, that Medicare would have to pay about $18,500.00 more toward procurement costs than it would if the trial judge had not reduced the judgment pursuant to the Maryland Act.[3]

In the trial court, appellant argued that the Maryland Act should not be applied because the MSP preempted it.  According to appellant's trial counsel, because the reduction of the judgment meant that Medicare's share of the procurement costs would increase, the intent of Congress would be thwarted inasmuch as Congress intended, when it enacted the MSP, to increase revenues to the U.S government "to the maximum extent possible."[4]

On October 31, 2016, the trial judge granted GBMC's post-trial motion to reduce the judgment.  In doing so, the court rejected the personal representative's preemption argument and, in accordance with the Maryland Act, the judgment was reduced to

---

[3] The dollar amount of the procurement costs was not provided to us.  Nevertheless, the parties agree that Medicare would, if the Maryland Act is enforced and the judgment reduced to $389,014.30, have to pay approximately $18,500.00 more in procurement costs than it would if the judgment was not reduced.

[4] As shown *infra,* there are situations where 42 C.F.R. § 411.37(c) is inapplicable and the Maryland Act does not affect Medicare recovery.

$389,014.30. The personal representative filed this timely appeal and raised one question, which she phrases as follows:

> Do the Medicare Secondary Payer ("MSP") provisions of federal law preempt a state law that diminishes the subrogation interest of the United States?

## I.

## <u>MOTION TO DISMISS APPEAL</u>

GBMC has filed a motion to dismiss this appeal because, purportedly, the appellant does not have standing to protect the rights of Medicare. According to GBMC, the personal representative's entire purpose in filing this appeal is to protect the interest of Medicare. GBMC argues:

> This Court has made clear, as a "fundamental principle of standing to appeal," that "an appellate court will not entertain an appeal by one who does not have an interest that will be affected by prosecuting the appeal." *Lopez-Sanchez v. State*, 155 Md. App. 580, 595 (2004), *aff'd*, 388 Md. 214 (2005). Similarly, the Court of Appeals has identified standing to appeal, *i.e.* "the sufficiency of an [appellant's] interest to maintain an appeal," as a question which the appellate court "can and must decide. . ." *Kreatchman v. Ramsburg*, 224 Md. 209, 215 (1961).

> In *Kreatchman*, the Court of Appeals explained:

>> It is firmly established, we think, that in order to maintain an appeal, the appellant must have an interest in the subject matter of the appeal. If he does not, we think that rule 835(b)(1) [now Rule 8-602(a)(1)] is applicable—that the appeal is not authorized by law and that this constitutes a ground for dismissal of the appeal; and, as we have said, the question of the sufficiency of interest is one to be determined by this Court and could not be tried and decided by the lower court. We conclude that this question is properly before us.

> *Id*. at 217 (footnote omitted).

7

We hold that the appellant does have standing because she has an interest that will be affected if she is successful in her appeal. If this Court were to agree with appellant that the MSP preempts the Maryland Act, appellant would receive approximately $44,442.00 more ($62,941.70 less $18,500.00) than she would receive if the Maryland Act was applied. We therefore reject GBMC's contention that this appeal should be dismissed for lack of standing.

## II.

## DISCUSSION

As already mentioned, Medicare made a conditional payment of Ms. Bromwell's medical bills in the amount of $157,730.75. The payments were conditional because, when the need for health care arose, Ms. Bromwell was eligible to receive Medicare benefits but there existed a possibility that Ms. Bromwell (or her personal representative) might be able to recover the amount paid for medical bills in a tort suit; in such situations, federal law provides that Medicare's responsibility to pay the cost of that health care is only "secondary" to the tortfeasor's insurance (or self-insurance). 42 U.S.C. § 1395y(b)(2). In the subject case, GBMC was self-insured. *See* 42 U.S.C. § 1395y(b)(2)(A)(ii) and 42 C.F.R. § 411.22.

42 U.S.C. § 1395y(b)(2)(B)(i) provides that a conditional Medicare payment may be made if a primary plan:

> has not made or cannot reasonably be expected to make payment with respect to such item or service promptly (as determined in accordance with regulations). Any such payment by the Secretary [of Health and Human

Services] shall be conditioned on reimbursement to the appropriate Trust Fund in accordance with the succeeding provisions of this subsection.

A "primary plan," insofar as here material, includes a self-insured plan such as the one GBMC had at the time Ms. Bromwell was injured. *See* 42 U.S.C. § 1395y(b)(2)(A)(ii) and 42 C.F.R. § 411.21.

42 U.S.C. § 1395y(b)(2)(B)(ii) reads, in material part, as follows:

(ii)    Repayment required

A primary plan, and an entity that receives payment from a primary plan, shall reimburse the appropriate Trust Fund for any payment made by the Secretary under this subchapter with respect to an item or service if it is demonstrated that such primary plan has or had a responsibility to make payment with respect to such item or service. A primary plan's responsibility for such payment may be demonstrated by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) of payment for items or services included in a claim against the primary plan or the primary plan's insured, or by other means.

(Emphasis added.)

Under the subsection of the MSP just quoted, GBMC, as well as appellant (an entity that receives payment from the primary plan), have a duty to repay Medicare inasmuch as GBMC's responsibility to repay Medicare for the medical bills was "demonstrated by a judgment[.]" In other words, before deducting for procurement costs, GBMC and the personal representative who received payment from GBMC, had an obligation to repay Medicare for any "item of service" paid by Medicare. Here, health care providers (who rendered services to Ms. Bromwell) presented bills to Medicare that totaled $210,106.49,

9

but Medicare made conditional payments only in the amount of $157,730.75.[5]  As a result of Medicare paying the lower amount, medical care providers wrote-off $52,375.74 ($210,106.49 - $157,730.75) of the charges.[6]

In arguing that the Maryland Act was preempted by the MSP, appellant relies on the legislative history of the MSP, beginning in 1980.  Appellant points out that prior to 1980, Medicare was a "primary payer" for most health services provided to Medicare beneficiaries.  Even when a beneficiary's need for services arose from an injury or an illness sustained as a result of negligence committed by a third-party whose private insurance could pay for such services, Medicare could not recover its payments.  In 1980, Congress changed the law to allow Medicare to recover from those third-party tortfeasors in order "to achieve major fiscal savings in the Medicare program." *United States v. Geier*, 816 F. Supp. 1332, 1336 (W.D. Wis. 1993).  To fulfill this goal, Congress passed the Medicare Secondary Payer (MSP) law and expressed its intent as follows:

> Under present law, [M]edicare is the primary payor . . . for hospital and medical services received by beneficiaries.  This is true even in cases in which a beneficiary's need for services is related to an injury or illness sustained in an auto accident and the services could have been paid for by a private insurance carrier under the terms of an automobile insurance policy.  As a result, Medicare has served to relieve private insurers of obligations to pay the costs of medical care in cases where there would otherwise be liability under the private insurance contract.  The original concerns that prompted inclusion of this program policy in the law . . . no longer justify retaining the policy, particularly if it is understood that immediate payment

---

[5] Over 120 medical bills were sent to Medicare in this case but Medicare, in every instance, paid the health care provider less than the amount billed.

[6] CareFirst also paid $10,565.26 less than the amount shown in the bills submitted to it, which Ms. Bromwell's health care providers also wrote off.

10

may be made by Medicare with recovery attempts undertaken only subsequently when liability is established.

H.R. REP. No. 1167, 96th Cong., 2d Sess. 389 (1980) (emphasis added), reprinted in 1980 U.S.C.C.A.N. 5526, 5752.

In *Zinman v. Shalala*, 67 F.3d 841 (9th Cir. 1995), the Court discussed the legislative purpose of the MSP stating:

> As first enacted, Medicare was the primary payer for medical services supplied to a beneficiary, even when such services were covered by other insurance such as an employer group health plan or liability insurance. Responding to skyrocketing Medicare costs, Congress in 1980 enacted the Medicare Secondary Payer legislation (MSP legislation), requiring Medicare to serve as the secondary payer when a beneficiary has overlapping insurance coverage. 42 U.S.C. § 1395y(b).

*Id.* at 843.

More recently, in 71 Fed. Reg. 9466, 9467 (February 24, 2006), the intent of the MSP was once again summarized:

> Beginning in 1980, the Congress enacted a series of amendments to section 1862(b) of the Social Security Act (the Act) (hereafter referred to as the Medicare Secondary Payer (MSP) provisions) to protect the financial integrity of the Medicare program by making Medicare a secondary payer, rather than a primary payer of health care services, when certain types of other health care coverage are available. (Workers' compensation had already been primary to Medicare since the implementation of the original Medicare statute.) In enacting the MSP provisions, the Congress intended that the MSP provisions be construed to make Medicare a secondary payer to the maximum extent possible.

(Emphasis added.)

Appellant's main contention in this appeal is that the Maryland Act, which allows a judgment to be reduced by a post-trial motion, conflicts with the "paramount Congressional

purpose" of the MSP.  Appellant argues that this "paramount [] purpose" was to ensure that the Medicare Program be reimbursed for its conditional payments "to the maximum extent possible."  To prove that this was Congress's "paramount" goal, appellant relies solely on the excerpt from the Federal Register just quoted.  That excerpt does not support appellant's argument.  To reiterate, it states that "Congress intended that the MSP provisions be construed to make Medicare a <u>secondary payer</u> to the maximum extent possible." (emphasis added).  42 C.F.R. § 411.21 states: "Secondary payments mean payments made for Medicare covered services or portions of services that are not payable under other coverage that is primary to Medicare."  Applying the Maryland Act in this case will not interfere with the goal of the MSP Act as enunciated in the Federal Register.  Here, if the Maryland Act is enforced, GBMC will be required to pay 100% of the conditional payments to appellant who, in turn, must reimburse Medicare.  In other words, GBMC, and not Medicare, will be the primary payer.  The fact that Medicare, based on its own regulations, has to pay a higher portion of the procurement costs than it would if the Maryland Act did not exist, does not change that result.

The case of *United States v Geier* provides a clear example of how federal courts have implemented Congress's intent that Medicare be a secondary payer to "the maximum extent possible."  816 F. Supp. 1332.

The *Geier* case arose in 1986 when Esther Geier was injured in an automobile accident.  *Id. at* 1334.  As a result of injuries received in that accident, Ms. Geier needed services provided by various health care providers.  Medicare made conditional payments

12

of Ms. Geier's bills in the amount of $11,150.93 and Hartford Insurance Company

("Hartford"), Ms. Geier's private health care insurer, paid an additional $1,494.71. *Id.*

Ms. Geier brought a tort suit against the motorist who had caused her injuries. After

a court trial, the other motorist was found negligent and Ms. Geier was awarded $1,500.00

for past medical expenses and $3,000.00 for past pain and suffering. *Id*. at 1335. The

liability insurer for the negligent driver, General Casualty Insurance Company ("General

Casualty"), deposited $1,500.00 with the clerk of the court for the payment of the medical

expenses and did so because a dispute had arisen between Hartford and the United States

government (representing Medicare), as to who should receive payment of the monies

deposited. *Id.* The United States then filed suit against Geier, Hartford and General

Casualty claiming it was entitled to the $1,500.00 at issue. The government relied on 42

U.S.C. § 1395y(b)(1) (1982 & Supp. V 1987), which at that time read:

> Payment under this subchapter may not be made with respect to any item or
> service to the extent that payment . . . can reasonably be expected to be made
> promptly . . . under an automobile or liability insurance policy or plan. . . .
> Any payment under this subchapter with respect to any item or service shall
> be conditioned on reimbursement to the appropriate Trust Fund . . . when
> notice or other information is received that payment for such item or service
> has been or could be made under such a law, policy, plan, or insurance. In
> order to recover payment made under this subchapter . . . the United States
> may bring an action against any entity which would be responsible for
> payment with respect to such item or service . . . or against any entity . . .
> which has been paid with respect to such item or service. . . . The United
> States shall be subrogated . . . to any right of an individual or any other entity
> to payment with respect to such item or service under such a law, policy,
> plan, or insurance.

The *Geier* Court, referring to the statutory language just quoted, said:

13

This statutory language, together with the accompanying regulations, legislative history for both the 1984 and 1989 amendments and the related case law, established that the Medicare payments to defendant Geier were conditional and that Congress intended for United States' claims to take priority over all other rights of recovery.

According to the regulations, it is evident that the medical claims paid by Medicare to defendant Geier as a result of the motor vehicle accident were conditional Medicare payments. 42 C.F.R. § 405.324(a). Section 405.324(a) states:

(1) If [the Federal Medicare Program] has information that services for which Medicare benefits have been claimed are for treatment of an injury or illness that was allegedly caused by another party and that the beneficiary has filed, or has the right to file, a liability claim against the other party, a conditional Medicare payment may be made. . . .

\*   \*   \*

(3) (i) If the beneficiary receives payment from an insurance carrier . . . she must reimburse Medicare up to the amount of the Medicare payment.

816 F. Supp. at 1335 (emphasis added).

The *Geier* Court, applying 42 U.S.C. § 1395y(b)(1) and 42 C.F.R § 405.324(a), held that Medicare had a right to recover the $1,500.00 awarded by the judge, because Medicare paid Geier conditionally for her medical expenses in reliance on Medicare's subrogated interest and the right to reimbursement. *Id.* at 1335-36. That holding was in harmony with Congress's intent that Medicare's claims were to have priority over all other claims.

In *Geier*, Hartford argued that, because it fulfilled its financial obligations to Geier and because Medicare simply paid for the medical cost remaining after Hartford's payments, Medicare had no right of reimbursement. *Id.* at 1336. The *Geier* Court held that whether Medicare paid for the remaining bills was irrelevant. In reaching its

14

conclusion, the *Geier* Court noted that the federal district courts applying both the 1984 and 1989 amendments to 42 U.S.C. § 1395y(b) had unanimously "held that the United States' right of reimbursement is paramount to any other claim." *Id.* at 1337 (citations omitted).

In *Geier*, Hartford also emphasized that its subrogation rights arose from its contractual relationship with Geier and not from Wisconsin common law. *Id.* The Court held that this also made no difference inasmuch as "[p]reemption occurs when Congress enacts a federal statute and expresses a clear intent to preempt state law or when there is an outright conflict between federal and state law." *Id.* (c*iting Louisiana Public Service Comm'n v. FCC*, 476 U.S. 355, 368 (1986)).

In her brief, appellant cites *Geier* and appears to rely on it, but no language in *Geier* supports appellant's position that in enacting the MSP Congress intended that Medicare recover its conditional payments to the greatest extent possible. *Geier* simply stands for the proposition that Medicare's "right of reimbursement is paramount to any other claim." 816 F. Supp. at 1337. Here, there were no competing claims between GBMC and any other insurer. After the Maryland Act was implemented, Medicare's claim remained paramount.

*Cox v. Shalala*, 112 F.3d 151(4th Cir. 1997) provides another example of a set of facts that resulted in a finding that the MSP preempted a state statute. In *Cox*, a Medicare beneficiary, Jack Cox, suffered severe injuries as a result of a motorcycle accident. In connection with that accident, Medicare made conditional payments of Mr. Cox's medical bills in the amount of $181,187.75. *Id.* at 153. After Mr. Cox died, his personal

representative, together with his surviving spouse and an heir, filed suit in North Carolina under that state's wrongful death statute. *Id.* Ultimately that suit was settled for $800,000.00. *Id.* The settlement received by the plaintiffs included the recovery of Mr. Cox's medical expenses, which Medicare had conditionally paid. *Id.* The North Carolina Wrongful Death Act contained a $1,500.00 limitation on the recovery of medical expenses in a wrongful death case. *Id.* That $1,500.00 limitation, if enforced, would mean that Medicare would receive less than 1% of the conditional payments it made. The *Cox* Court said:

> Under this provision [of the North Carolina Wrongful Death Act], the appellants, as Jack Cox's intestate heirs, are allowed to recover for Jack Cox's medical expenses, and Medicare's subrogated right to recover those medical expenses is limited to $1,500 of the $181,187.75 which Medicare conditionally paid on Jack Cox's behalf. *See Forsyth County v. Barneycastle*, 18 N.C.App. 513, 197 S.E.2d 576, 579 ($1,500 limit on creditor's right to recover strictly construed), *cert. denied*, 283 N.C. 752, 198 S.E.2d 722 (1973). Thus compliance with Medicare's secondary payer provisions, which mandates full payment for Jack Cox's medical expenses from the $800,000 settlement, is impossible because of the NC Wrongful Death Act's $1,500 limitation on the recovery of medical expenses.

> [T]he NC Wrongful Death Act's $1,500 limit on Medicare's right to receive payment for services from a NC Wrongful Death Act settlement is in direct conflict with Medicare's secondary payer provisions which mandates full reimbursement. Consequently, to the extent the NC Wrongful Death Act limits Medicare's right of recovery under the circumstances of this case to $1,500, the NC Wrongful Death Act is preempted. Accordingly, the district court correctly granted summary judgment to Secretary Shalala on her counter-claim.

112 F.3d at 155 (emphasis added).

In her brief, appellant discusses the *Cox* case in detail, and accurately sets forth its holding. But, we fail to see how anything set forth in the *Cox* case helps appellant in this

16

case. The Maryland Act allows a plaintiff to obtain a judgment for past medical expenses conditionally paid by Medicare and to recover every penny of medical expenses paid by or on behalf of the plaintiff. Thus, unlike the situation in *Cox*, the plaintiff's recovery for past medical expenses is not artificially or arbitrarily reduced. The Maryland Act only restricts verdicts by prohibiting a plaintiff from recovering medical expenses that were never actually incurred. Unlike the North Carolina law discussed in *Cox*, the Maryland Act does not conflict with the MSP provision that mandate full reimbursement of conditional payments made by Medicare.

At oral argument, appellant's counsel argued that the legislative intent of the MSP as expressed in the Federal Register (i.e., that provision of the MSP be construed to make Medicare a secondary payer to the maximum extent possible) is just another way of saying that the Congressional intent was that the Medicare program be reimbursed for conditional payments "to the maximum extent possible." We see no equivalency. The intent of the MSP, insofar as it relates to this case, was "that the Medicare program be reimbursed whenever a private insurer is obligated to pay medical costs." *Geier*, 816 F. Supp. at 1337. Clearly, that intent is not the same as an intent that the Medicare program be reimbursed for conditional payments "to the maximum extent possible." Moreover, there is no indication that Congress's paramount purpose was the one appellant advocates. As appellant's counsel admitted in oral argument, the federal government, if it wanted to do so, could have required the beneficiary, after he or she makes a tort recovery for medical expenses, to repay Medicare for its conditional payments in full – without making any

17

deduction for procurement costs. If Congress had done so, as appellant admits, the Maryland Act could be implemented without any effect on the amount Medicare would recover. But the United States Department of Health and Human Services (HHS), the governmental entity charged with implementing the MSP, chose to adopt 42 C.F.R. § 411.37(c). That regulation requires HHS to share procurement costs under certain circumstances. Adoption of 42 C.F.R. § 411.37(c) insured that HHS would not recover its conditional payments "to the maximum extent possible" in situations where section 411.37(c) was applicable. If Congressional intent was the intent attributed to it by appellant, it would be, to say the least, strange that 42 C.F.R. § 411.37(c) would have been adopted. Furthermore, if appellant's argument were to be accepted, a very odd type of preemption would exist. The Maryland Act would only be preempted if the beneficiary brought suit against the primary payer. But the Centers for Medicare & Medicaid Services ("CMS"), on behalf of HHS, has the right to bring a direct action against any entity responsible for payment of medical bills. *See* 42 U.S.C. § 1395y(b)(2)(B) and 42 C.F.R. § 411.24(e) ("CMS has a direct right of action to recover from any primary payer."). If CMS sued GBMC to recover the conditional payments, the Maryland Act would have no effect because CMS could only collect the amount of medical bills it paid. Procurement costs and write-offs (and thus the Maryland Act) would be irrelevant. It would be illogical to resolve the preemption question by holding 1) that the Maryland Act is preempted in cases where a beneficiary sues a primary payer and incurs procurement costs that must be paid,

18

in part by CMS but 2) also holding that the Act is not preempted in cases where the CMS sues the primary payer directly.

There is another situation when the Maryland Act would be inapplicable: i.e., where the amount recovered is equal to or less than the conditional payment, the regulations allow the beneficiary to deduct all of the procurement costs from the amount received from the primary payer, before paying Medicare the balance. 42 C.F.R. § 411.37(d). In such cases, the Maryland Act does not impact the number entered into the formula. Therefore, as in the cases where the CMS sued the primary payer directly, the Maryland Act has no effect on how much the CMS collects.

For all of these reasons, we reject appellant's argument that Congress intended, when it enacted the MSP, that Medicare be reimbursed for its conditional payments "to the maximum extent possible." Instead, Congress's intent was that the MSP be construed to make Medicare a "secondary payer to the maximum extent possible." The Maryland Act does not conflict with that intent.

As both parties to this appeal admit, a state law may be preempted by federal law when it conflicts in one of the following ways: (1) When the state law "sharply" interferes with, or is directly contrary to a federal law; or (2) When compliance with both federal and state law is a physical impossibility. *Cox*, 112 F.3d at 154. (State statute can be preempted if it conflicts with federal law in one of two ways: "First, a conflict between state and federal law can arise when compliance with both federal and state regulations is a physical impossibility . . . [and second] when a state . . . statute 'sharply' interferes with, or is

19

directly contrary to a federal law . . . .")(citations omitted); *Hosford v. Chateau Foghorn LP*, 229 Md. App. 499, 510, *cert. granted sub nom. Chateau Foghorn v. Hosford*, 455 Md. 462 (2017) ("conflict preemption applies either: (1) where it is impossible for a private party to comply with both state and federal requirements, or (2) where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress")(citations and quotation marks omitted.)  In this case it is clear that the Maryland Act does not "sharply" interfere with the MSP, nor is it directly contrary to a federal law. This is shown by a close reading of the section of the MSP that spells out what amount Medicare is entitled to recover when a plaintiff makes a recovery against a primary plan such as GBMC's self-insurance plan.  A primary plan and an entity (such as appellant) must reimburse Medicare "for any payment made" by Medicare "with respect to an item or service if it is demonstrated that such primary plan has or had a responsibility to make payment with respect to such item or service."  42 U.S.C. § 1395y(b)(2)(B)(ii).  The payment made by Medicare for all items or services in this case was $157,730.75. Therefore, GBMC's obligation to repay Medicare is only $157,730.75 and the judgment entered by the Circuit Court for Baltimore County requires this amount to be paid.  Nor is any provision of the Maryland Act "directly contrary" to federal law.  Thus, compliance with the Maryland Act and the MSP is not a "physical impossibility."

By the regulations adopted after the passage of the MSP, the Department of Health & Human Services (HHS) developed the formula by which Medicare's share of the procurement cost is calculated and deducted from the recovery amount unless: 1) the CMS

20

does not sue the primary payer directly, or 2) the amount recovered is equal to or less than the conditional payment. We agree with GBMC that the fact that the Maryland Act impacts the numbers being "entered into" that formula under certain circumstances does not create a conflict with federal law.

Besides its principal argument, discussed *supra*, appellant makes a separate argument that is founded upon the fact that GBMC waited eleven days after the $451,956.00 judgment was entered before filing its motion "to reduce verdict/judgment." Appellant asserts: 1) GBMC's filing of a post-trial motion did not stop the 30 day appeal period from running; and 2) instead, the 30 day appeal period expired on September 22, 2016, which was 30 days after the trial judge denied appellant's (and other plaintiffs') motion for new trial or in the alternative an *additur*. Based on those assertions, appellant argues:

> GBMC neither contested nor disputed the Judgment as to its liability in this case. GBMC's status as a "primary payer" for Medicare's conditional payments arose on September 22, 2016, when GBMC's right to appeal from the Judgment fixing its liability expired. GBMC concedes that it's only post-verdict Motion, requesting a reduction under § 3-2A-09(d)(1), was filed under Rule 2-535 only. These undisputed facts compel the conclusion that the trial court in this case applied § 3-2A-09(d)(1) to modify *a final and non-appealable judgment*, as distinguished from a verdict.

> This distinction between a verdict and a judgment is critically important to federal MSP preemption, because federal law establishes that Medicare's right to reimbursement attaches when the responsibility of a primary payer has been "demonstrated," *e.g.*, by a judgment[.]

> \* \* \*

> Under federal MSP law and regulations, therefore, a simple jury verdict against a primary plan (or primary payer) is insufficient; the verdict must be

21

reduced to a final, non-appealable judgment. When a final and non-appealable judgment binds a primary payer, that payer's responsibility to reimburse conditional payments to Medicare is demonstrated under federal law.

Federal preemption applies in this case because Medicare's subrogation interest in the Judgment dated July 22, 2016, arose and existed under federal law ***before*** the trial court applied § 3-2A-09(d)(1) to reduce that Judgment.

(Footnote omitted.)

The above argument contains one fatal flaw: the assertion that Medicare, as well as appellant, had a "final, non-appealable" $451,956.00 judgment as of September 22, 2016 and therefore the trial judge applied the Maryland Act to "a final, non-appealable judgment." This flaw in appellant's argument is demonstrated by the Court's holding in *Gluckstern v. Sutton*, 319 Md. 634 (1990). In *Gluckstern*, judgment was entered on January 27, 1988, but the petitioner waited twenty days after judgment to file a pleading that the Court of Appeals treated as a Maryland Rule 2-535(a) motion to revise judgment. *Id*. at 646, 651. That judgment was revised, in part, on July 14, 1988. *Id.* at 646-47. Petitioner filed his notice of appeal within thirty days of July 14, 1988. *Id.* at 647. The appellee in *Gluckstern* contended that the appeal was not timely because it was not filed within thirty days of January 27, 1988. The *Gluckstern* Court rejected appellee's argument:

> As Dr. Gluckstern filed a timely motion to revise the judgment in accordance with Rule 2-535(a), as there was no timely notice of appeal prior to revision of the judgment, and as the judgment was in fact revised on July 14, 1988, the order entered on July 14, 1988, became the final judgment. The controlling principles were set forth in *Yarema v. Exxon Corp.*, [] 305 Md. [219,] 240-241, 503 A.2d at 250 [(1986)], as follows:

> "Rule 2-535(a), formerly number Rule 625a, authorizes the circuit court to exercise revisory power over a judgment on a motion filed within

22

thirty days from the judgment. Nevertheless, it is settled that neither the timely filing of a motion to revise a final judgment nor the court's denial of such motion, absent an order staying the operation of the judgment, affects the finality of the judgment or the running of the time for appeal. *Unnamed Atty. v. Attorney Griev. Comm'n*, 303 Md. 473, 484, 494 A.2d 940 (1985); *Hardy v. Metts*, 282 Md. 1, 5, 381 A.2d 683 (1978); *Hanley v. Stulman*, 216 Md. 461, 467, 141 A.2d 167 (1958). But when a motion under Rule 2-535(a) to revise a final judgment is filed within thirty days and the circuit court in fact revises the judgment, and there has been no intervening order of appeal, the prior judgment loses its finality and the revised judgment becomes the effective final judgment in the case. *Unnamed Atty. v. Attorney Griev. Comm'n, supra*, 303 Md. at 484, 494 A.2d 940; *Brown v. Baer*, 291 Md. 377, 387, 435 A.2d 96 (1981)."

Moreover, under circumstances like those in this case, as long as the motion to revise the judgment is filed within 30 days, the revised judgment need not be entered within 30 days of the original judgment. *Brown v. Baer, supra*, 291 Md. at 387, 435 A.2d at 101.

Consequently, Dr. Gluckstern's notice of appeal, filed within 30 days of the revised judgment, was timely.

*Id*. at 651.

The legal principle set forth in *Gluckstern*, as applied to this case, shows that GBMC's responsibility for payment of Ms. Bromwell's medical expenses was not finally "demonstrated" until October 31, 2016, the date the revised judgment was entered. Contrary to appellant's argument, the trial judge did not apply the Maryland Act "to a final, non-appealable judgment."[7]

---

[7] In a case recently decided by the United State Court of Appeals for the Fourth Circuit that involved the same parties as in this appeal, the Bromwell Estate contended, as it does here, that the date of the final judgment in this case was not October 31, 2016. *See Netro, Personal Representative of the Estate of Barbara Bromwell v. Greater Baltimore Medical Center*, _____ F.3d. _____, No. 17-1597, slip op. 12 (4th Cir. June 4, 2018). The Court rejected that contention for the same reason that we rejected it. *Id*.

## CONCLUSION

The MSP does not preempt any part of the Maryland Act.  The purpose of the MSP was to ensure that Medicare is the secondary payer of medical bills to the greatest extent possible.  The Maryland Act, as implemented by the trial judge in this case, in no way interfered with, or conflicted with that purpose.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.

Bessie Decker, Clerk
April 20, 2018